(157 App. Div. 276.)

ARMENTI v. BROOKLYN UNION GAS CO. et al.

(Supreme Court, Appellate Division, Second Department. May 23, 1913.)

1. APPEAL AND ERROR (§ 927*)—PRESUMPTIONS—NONSUIT.
    Where the complaint is dismissed at the close of plaintiff's case, plaintiff is entitled on appeal to the most favorable construction of the evidence.
    [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2912, 2917, 3748, 3758, 4024; Dec. Dig. § 927.*]

2. MASTER AND SERVANT (§ 125*) — INJURIES TO SERVANT — SAFE PLACE TO WORK—STATUTES—KNOWLEDGE.
    Labor Law (Consol. Laws 1909, c. 31) § 18, providing that a person employing another for the erection or alteration of a building or structure shall not furnish or erect hoists, stays, ladders, or other mechanical contrivances which are unsafe, imposes upon a master the affirmative duty of furnishing safe stays and renders him liable, regardless of his knowledge.
    [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 243–251; Dec. Dig. § 125.*]

3. MASTER AND SERVANT (§ 107*) — INJURIES TO SERVANT — "STRUCTURE" — "STAY."
    A concrete sewer located beneath the surface of a street is a "structure," within Labor Law (Consol. Laws 1909, c. 31) § 18, providing that a master engaging another to perform labor in the erection of a structure shall not furnish any unsafe stay or mechanical contrivance, and sheathing, shoring, and bracing used to hold back the earth out of the excavation are stays; a "stay" meaning that which holds, restrains, or supports.
    [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 199–202, 212, 254, 255; Dec. Dig. § 107.*
    For other definitions, see Words and Phrases, vol. 7, pp. 6700–6702; vol. 8, p. 7806.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. STATUTES (§ 279*)—NECESSITY OF PLEADING.

A general statute need not be pleaded.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 378; Dec. Dig. § 279.*]

5. MASTER AND SERVANT (§ 258*) — INJURIES TO SERVANT — ACTIONS — COMPLAINT—SUFFICIENCY.

In an action for the death of a servant killed by the caving in of an excavation for a sewer, the complaint, among other acts of negligence, charged that defendant failed to properly shore and support the excavation. *Held* that, while the complaint did not plead Labor Law (Consol. Laws 1909, c. 31) § 18, providing that a master shall not furnish a servant engaged in the erection of a structure with any insufficient stay, yet as this is a general statute, which need not be pleaded, the complaint was sufficient to charge the master with liability thereunder; evidence that the caving in was caused by the insufficient stays being admissible.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 816–836; Dec. Dig. § 258.*]

6. APPEAL AND ERROR (§ 232*)—PRESENTATION OF GROUNDS OF REVIEW—RECORD—DISMISSAL.

Where plaintiff is nonsuited at the close of his evidence, every question which can be fairly raised upon the record may be urged on appeal; the rule that a party cannot change his theory of action on appeal not applying.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1351, 1368, 1426, 1430, 1431; Dec. Dig. § 232.*]

Action by Angelina Armenti, as administratrix of Francesco Armenti, deceased, against the Brooklyn Union Gas Company and others. At the close of plaintiff's case the complaint was dismissed, and the exceptions were ordered to be heard in the first instance by the Appellate Division. Exceptions sustained.

See, also, 141 N. Y. Supp. 1107.

Argued before JENKS, P. J., and BURR, THOMAS, CARR, and STAPLETON, JJ.

Thomas J. O'Neill, of New York City (L. F. Fish, of New York. City, on the brief), for plaintiff.

Frank V. Johnson, for defendant Rodgers & Hagerty.

BURR, J. [1] This action is brought to recover for the pecuniary injury resulting from the death of Francesco Armenti on the 20th of November, 1908, through the caving in of an excavation made through Gold street, in the borough of Brooklyn, for the purpose of constructing a sewer. Plaintiff's intestate was in the employ of defendants Rodgers & Hagerty, who had a contract with the city of New York for such construction. The Brooklyn Union Gas Company and the Edison Electric Illuminating Company were originally joined with Rodgers & Hagerty as parties defendant. When the action was brought to trial, the complaint was dismissed as to the gas company and the illuminating company on the pleadings and opening of counsel. The propriety of this ruling was acquiesced in. At the close of plaintiff's case the complaint was dismissed as to the defendants Rodgers & Hagerty, and the exceptions were ordered to be heard in the first instance at the Appellate Division of this court. Under such

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

circumstances, plaintiff is entitled to the most favorable construction of the evidence.

The complaint alleged the service of a notice under the Employer's Liability Act. When offered in evidence, it was excluded as defective and insufficient. The notice is not made a part of this record, and the correctness of this ruling seems to have been conceded. Defendants' liability, if any, must therefore rest upon a breach of a master's obligation to his servant, unaffected by that statute.

The causes for the accident, and the grounds of negligence set forth in the complaint as amplified by the bill of particulars, were various. The one finally relied upon was failure to properly shore, support, and secure the sides of the excavation made for the construction of such sewer, and to maintain such shoring so that it should be safe and suitable. The questions presented, therefore, are twofold: First. Does the evidence permit a finding that the subsidence occurred because the shoring and bracing gave way, and, if so, are the defendants liable therefor? The sewer was built of concrete, was nearly circular in form, about 17 feet in diameter, and was laid at the bottom of an open trench about 18 feet wide and about 45 feet deep. On the day of the accident about 135 feet of this trench was open. The sewer had been constructed in two sections, and the lower half or invert of the sewer at the bottom of the trench had been completed. This invert was at least 7 feet in height from the bottom of the excavation, and extended the entire width thereof between the sheathing on either side. Defendants were about to place upon the top of the completed invert iron forms over which concrete was to be put to the thickness of 2 feet or more, making in connection with the previously constructed invert a completed tube, and while thus engaged the sides of a portion of this open cut caved in, and plaintiff's intestate was caught in the mass of falling material and killed. After the occurrence earth, timber, gas mains, pipes, masonry, and even the paving and flagging which had been upon the surface of the street adjoining the excavation, were mingled together at the bottom thereof in such confusion that it would be at least difficult to draw any very satisfactory conclusion from what then appeared as to the manner of construction.

There is evidence, however, most of which was given by four of the workmen employed in the construction of said sewer, from which a jury could have found the following facts: In preparing the excavation for the reception of this concrete structure, the sides thereof had been sheathed with planking about two inches in thickness. This sheathing was supported by "rangers" running longitudinally along the sides of the sheathing on the inner side thereof. These rangers consisted of planks from 9 to 12 inches in width. Across the excavation and supporting these rangers were cross braces horizontally placed. There is a slight variance in the testimony as to the distance which separated these cross braces; but the greater weight of the more reliable testimony is that they were 5 feet apart, measured in a vertical line, and 6 or 8 feet apart horizontally. It appeared that, in order to make room for the iron forms which were to be placed upon the top of the completed invert, it was necessary to remove a part of this

cross bracing, and there is no suggestion that the method adopted of building the lower half of the sewer and then placing upon that the iron forms to sustain the concrete for the construction of the upper half, and the removal of a portion of the cross bracing in order to permit this to be done, was not a proper method of construction if carefully employed. Di Crescenti, a fellow workman of decedent, who, upon the morning when the casualty occurred, was engaged in filling in that portion of the excavation where the sewer had been completed, testified that on previous occasions it had been the custom to place forms about 25 or 30 feet long, removing the cross bracing for that purpose. On this day, when the work was approaching completion, the space cleared for the forms was 60 feet in length. It appears that it was the duty of a gang, known as the carpenter's gang, to construct the supports for the excavation, and to prepare for the placing of the iron forms when that became necessary. Decedent was a member of a gang known as the concrete gang, whose duty it was to prepare and lay the concrete when the forms had been put in place. Di Crescenti testified that on the morning in question the carpenter's gang had taken away three lines of cross braces, one over the other, for a distance of 60 feet, leaving only 5 or more of these cross braces between the top of the excavation and the point where the lower cross brace remained, instead of 10 or 11 as had previously been employed. He also testified that he noticed that the timber which was the lowest of those not taken away started to break, and then the sheathing boards commenced to give in below, and that after the earth had fallen from down below then the top came down too. He testified that he heard a cracking sound about four or five minutes after the braces had been removed, and that none of the shoring planks fell until after the brace broke. Guerra, another fellow workman of decedent, testified that three rows of these cross braces, measured in a vertical line, had been taken away, leaving a space of 15 feet, measured from the bottom of the trench toward the top. Another witness, Heitmann, testified that he heard a rumble and cracking of timber, and then saw everything on both sides falling in the trench toward the center of the street. He adds:

"A little after everything was falling towards the center, the open gas main started in to light up."

Ernest C. Moore, called as an expert witness by plaintiff, who on the day after the accident examined that portion of the excavation immediately adjoining the place of the subsidence which had escaped destruction, also testified as to the construction there employed, and his testimony does not vary substantially from that given by the coemployés of decedent in the particulars above specified. He gave some additional testimony from which a jury might have found that the sheathing planks were of unequal length, varying from 10 to 15 feet, and that owing to the depth of the excavation it was necessary to employ three or more of these planks placed one on top of the other. The ends of these planks were referred to in the evidence as "butts," and these ends were not spliced together. While it seems to have been the purpose to place one of these rangers across these butts or

ends of the planks, owing to the unequal length thereof at many places the butts were not covered by the rangers, in some instances being above and in some instances below these. In other words, the rangers did not couple the joints. Moore was asked the question:

"Do you mean that the butts of these plank were somewhat like the teeth of a saw, some up and some down?"

And he answered:

"That is the point exactly, they were not all on the same line."

There was also evidence that it was the custom, when cross braces were removed to permit the forward motion of the iron forms, to substitute for these a truss construction extending from the ranger or stringer formerly braced by the cross brace to the next cross brace above, and that in this instance such construction was omitted, and the shoring was nailed to the cross braces remaining overhead by wire nails. There was also evidence that after the accident, while the paint upon some of the buildings facing upon the street was scorched, indicating the presence of heat and possible contact with flame, with two or three exceptions none of the glass in the windows of these houses was broken, and from this is it argued that no explosion could have taken place. The strength of this testimony was in some instances affected by cross-examination; but in the absence of any contradiction or explanation it was for a jury to determine whether the cause of the subsidence in question was the giving way of the shoring and bracing intended to support the sides of the trench. Assuming that a jury should find that this was the physical cause of the subsidence, what, if anything, more was plaintiff called upon to establish, in order to make out a prima facie case of defendants' liability?

[2] If such liability is to be measured solely by common-law rules, plaintiff would have been obliged to proceed further and, having established the physical cause of the subsidence, also show some omission of duty or negligent act upon the part of decedent's masters personally, or upon the part of those for whose acts or omissions they are responsible. We need not decide whether this requirement has been met, and whether the case is controlled by the principle laid down in the cases of which Butler v. Townsend, 126 N. Y. 105, 26 N. E. 1017, and Kimmer v. Weber, 151 N. Y. 417, 45 N. E. 860, 56 Am. St. Rep. 630, are types, or by that exemplified in Simone v. Kirk, 173 N. Y. 7, 65 N. E. 739. In 1885 a statute was passed materially affecting the measure of a master's liability with respect to the cases therein specified. Laws of 1885, c. 314, as amended Laws of 1891, c. 214. The provisions of this statute, with some changes and alterations therein, were embodied in the Labor Law of 1897 (Laws of 1897, c. 415), and have been re-enacted in the present Labor Law (Consolidated Laws, c. 31 [Laws of 1909, c. 36]). In 1908, when this accident happened, this statute contained, among others, this provision:

"A person employing or directing another to perform labor of any kind in the erection, repairing, altering or painting of a house, building or structure shall not furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders or other mechanical contrivances which are unsafe, unsuitable or improper, and which are not

so constructed, placed and operated as to give proper protection to the life and limb of a person so employed or engaged." Id. § 18.

This statute "lays upon the master a positive prohibition, from the violation of which neither his own ignorance nor the carelessness of his servants will shield him." Caddy v. Interborough Rapid Transit Co., 195 N. Y. 415, 88 N. E. 747, 30 L. R. A. (N. S.) 30. An affirmative and imperative duty is thereby imposed upon the master, regardless of his knowledge, and not dependent upon the affirmative evidence of negligence. Whenever a stay or other mechanical appliance is furnished to be used in erecting a structure, it must be safe, suitable, and proper for the ordinary uses for which it is intended, or the employer is liable.

[3] That this concrete sewer, although located beneath the surface of the street, is a structure, seems to be settled by authority. Caddy v. Interborough Rapid Transit Co., supra; Madden v. Hughes, 104 App. Div. 101, 93 N. Y. Supp. 324; Stevens v. Stanton Construction Co., 153 App. Div. 82, 137 N. Y. Supp. 1024. That this sheathing, shoring, and bracing are included in the terms of this statute also seems reasonable. A stay generally is "that which holds or restrains" (Century Dictionary, title "Stay"); "that which supports" (Standard Dictionary, Id.); "that which serves as a prop" (Webster's Dictionary, Id.). Specifically, as applied to building, it is "a piece performing the office of a brace, to prevent the swerving or lateral deviation of the piece to which it is applied" (Century Dictionary, Id.).

Defendant contends that the beneficent provisions of this statute are to be limited, however, to appliances furnished to an employé, with which he is to perform his labor, and not to structures intended, as was this sheathing, shoring, and bracing, to prepare the place where work should be performed and render it more safe. We deem this construction too narrow. The object of the statute was to procure a safer condition for workmen engaged in work more or less hazardous in character.

"The statute must be given a fair and reasonable meaning which will neither extend it beyond nor withdraw it from its intended effect." Gombert v. McKay, 201 N. Y. 27, 94 N. E. 186.

The thing which by the statute the master is forbidden to do is, first, to "furnish" things specified which are "unsafe, unsuitable and improper"; and, second, to "erect" such things. The things specified must not alone be "operated" so as to give proper protection to the life and limb of a person employed or engaged in work, but must be "constructed" and "placed" to secure the same result.

[4-6] Finally, it is urged upon us that the complaint is not so framed as to charge defendant with liability under this statute, and that in the trial court no attempt was made to invoke its provisions. The complaint is certainly very general, and almost every conceivable ground of liability is asserted therein. But among other allegations of the cause of the subsidence from which the death of plaintiff's intestate resulted is "that said defendants failed to properly shore, support, and secure the excavation and the ground contiguous thereto."

This is sufficient to allow the evidence that this was the physical cause of the "cave-in." If, when that fact is established, legal liability follows under the statute, the complaint cannot be successfully attacked for insufficiency; for the statute, being a general one, need not be pleaded. Haggblad v. Brooklyn Heights R. R. Co., 117 App. Div. 838, 102 N. Y. Supp. 1039. Nor is it fatal that this point was not called to the attention of the trial court. It may be that when a case has been submitted to a jury upon a particular theory it is too late for a plaintiff, who has been unsuccessful upon the issue tendered, to inject into the case on appeal another distinct element adding to the liability of the defendant, and which he has never been called upon to meet (Rager v. Delaware, L. & W. R. R. Co., 64 App. Div. 134, 71 N. Y. Supp. 851); but in the case of a nonsuit a different rule applies.

"Every question is open to the plaintiff which can fairly be raised upon the record." Clemence v. City of Auburn, 66 N. Y. 334; Train v. Holland Purchase Ins. Co., 62 N. Y. 598; Pratt v. D. H. M. F. Ins. Co., 130 N. Y. 206, 29 N. E. 117.

We have previously considered cases arising out of the same casualty as that from which Armenti's death resulted. In Di Crescenti v. City of New York, 149 App. Div. 816, 134 N. Y. Supp. 305, in which case we reversed a judgment of nonsuit against the same defendants, we did say that the rule of res ipsa loquitur did not apply to the extent that the mere happening of the subsidence, without any evidence as to the probable cause thereof, was, under the circumstances there disclosed, sufficient to impose upon defendants a prima facie liability, and we followed that rule in Tengstrom v. Rodgers, 155 App. Div. 405, 140 N. Y. Supp. 249. But we decided in the Di Crescenti Case, as we do now, that if the evidence was sufficient to require submission to the jury of the question whether the cause of the subsidence was defective shoring a nonsuit was improper, although in that case the application of the Labor Law to the facts of the case was not considered.

It follows that the plaintiff's exceptions must be sustained and a new trial be granted; costs to abide the event. All concur.