GEORGE FIEDERLEIN et al., Appellants, v HOCHBERG BROS. et al., Respondents. (And Third- and Fourth-Party Actions.)

Second Department, December 21, 1981

APPEARANCES OF COUNSEL

*Friedman, Friedman, Levy & Bottiglieri, P.C. (Richard D. Friedman, Robert A. Levy* and *Mark Tobak* of counsel), for appellants.

*Harold M. Foster (Jones, Hirsch & Bull [Norman S. Goldsmith]* of counsel), for Hochberg Bros. and another, respondents.

*McCormick Dunne & Foley (Joseph P. Altman, Jr.,* of counsel), for Ehrenfeld & Feldman, individually and as copartners, d/b/a Chrystie Street Company, respondents.

*Leonard A. Sheft & Assoc. (Richard T. Farrell* of counsel), for fourth-party defendant.

OPINION OF THE COURT

GIBBONS, J.

At the close of a jury trial on the claims of the injured plaintiff (his wife sues derivatively) that the roof bridge or

extension from which he fell was negligently constructed and/or maintained by the defendants, owners of the buildings between which the roof extended, the trial court dismissed the complaint on the ground that, as a matter of law, the defendants owed no duty to plaintiff to keep the premises where the roof collapsed safe for him and that, in the circumstances, there was no duty to warn. We reverse. The case should have been permitted to go to the jury on the question whether, in fact, the conduct of the defendants in the construction and maintenance of the roof extension was reasonable under all the circumstances.

At approximately 7:30 P.M. on the rainy evening of December 26, 1973, George Fiederlein, a cable splicer for the New York Telephone Company, went to the roof of the building at 139 Bowery Street, Manhattan, to undertake repairs to "a splice and terminal box"[1] in order to restore telephone service in the nearby area. Fiederlein and his partner, Brian Comer, were the second team of two cable splicers to arrive on the roof. The men got to the roof by entering 139 Bowery with the tenant's permission,[2] going up a flight of stairs to her second-floor apartment and climbing out of a bathroom window of the apartment. The roof was well lit by a floodlight and the splice could be seen when one exited the window. It was about 17 feet from the window, located on the wall of 115 Chrystie Street, the building which was adjacent to the rear of 139 Bowery. The terminal box was on the right hand side of the window on the wall of 139 Bowery.

To reach the splice, the men walked across the tarred roof, which was one level until approximately three feet from the wall where the splice was located. The last three

---

1. A terminal box was described as being two feet by eight inches and holding the "bridel", the wire from a telephone which connects it to the system. A terminal may have between 12 and 300 pairs of lines; each pair represents a telephone.

A splice is a covering over several telephone cables. When cables are stripped and put together with connections, they are wrapped and water-proofed by being sealed with hot lead. The splice in question contained wires from the terminal box at 139 Bowery and from other terminal boxes in the area: "[I]t [was] a junction that [went] through the whole block."

2. The tenant was the daughter of Henry Lewis, the president of fourth-party defendant Lady Lesley, Ltd. Lady Lesley leased the entire building and had done so for approximately 25 years. In recent years, the second and third floors were no longer needed by the corporation for its factories. At the time of the accident, the second floor was rented as a residential loft and third floor was used as a warehouse.

feet were some 15 or 18 inches higher than the rest of the roof. The higher level was reached by stepping up the 15 or 18 inches. Both the step-up and the raised three-foot wide level were surfaced exactly as the roof was. Both levels looked the same and felt the same underfoot.

The first team of cable splicers to arrive, Paul Diomede and his partner, determined upon tests of the terminal box that the cable failure or break in the cable was in the middle of the splice. The splice would have to be opened by chipping away the lead covering. Although the splice could be reached from the roof, i.e., from the raised area, the two men put up a ladder so that the chipping could be done from a higher position to avoid having lead chips fly into the splicer's face.

Diomede and his partner placed the ladder against the brick wall of 115 Chrystie Street, with the feet of the ladder resting on the lower level of the roof. When Diomede's partner had nearly completed the chipping, Fiederlein and Comer arrived. Comer went up onto the raised area once to look at the splice and Diomede stepped onto the section perhaps three or four times after the second team's arrival. Fiederlein then stepped up and began to tape burnt pairs of wire in the now open splice.

After working some 15 minutes, Fiederlein asked Diomede to hand him some more tape. Diomede procured the tape from a bucket nearby, walked over to Fiederlein, put one foot next to Fiederlein's and proffered the tape. "[A] tremendous crack" was heard and Fiederlein fell through the three-foot raised section that had opened like "a trap door."

What had appeared to be merely a raised portion of a single roof was, instead, a 3-foot wide, 20-foot long cover over an air space. In the opinion of the expert engineer who examined the premises some five months after the accident, the reason for the structure's failure was a combination of poor construction and design and poor maintenance.

Plaintiffs also adduced proof that as early as 1948 the splice was located on the wall of 115 Chrystie Street and the terminal box on 139 Bowery. It was not surprising, therefore, that there was testimony that telephone com-

pany repairmen had come to 139 Bowery numerous times over the preceding years "[to] check the line in back". They had been admitted to the roof by the lessee, Lady Lesley, Ltd.[3]

There was also evidence that defendants Hochberg Bros. and Schwartz Realty had secured building permits to undertake certain construction at 139 Bowery and that they had, in addition, had a new roof put on within the past 15 or 20 years.

Hochberg and Schwartz defended, in addition to cross-examination that attempted to establish plaintiff's contributory negligence, on the basis that the covered air space antedated their purchase of the building in 1937. Land surveys indicated that the air space between the two buildings was "covered over" at least since 1927, evidently soon after the 115 Chrystie Street building was erected behind 139 Bowery and, as shown by a 1950 survey, the space continued to be "a covered roof."

The trial court granted defendants' motions to dismiss the complaint on the ground that Fiederlein was an unexpected entrant whose duty to repair took him to portions of the premises where access was not usual.[4] In such circumstances, defendants owed the plaintiff only the duty to warn of the dangerous condition if the defendants knew it existed and provided they had a reasonable opportunity to convey such warning. The trial court held that the duty to warn had not arisen.

The authority upon which the trial court relied is PJI 2:93, which expressed the rule enunciated in *Beedenbender v Midtown Props.* (4 AD2d 276). The *Beedenbender* rule was formulated during the time the duty owed by an owner/possessor of land in New York to one who came upon the land was determined by the status of the entrant, i.e., the nature of the duty that arose depended upon whether

---

3. Henry Lewis, president of Lady Lesley, Ltd., testified to the visits to the building by employees of the telephone company.

4. This was the ground advanced by defendants Hochberg Bros. and Schwartz Realty. Defendants Chrystie Street Company, and Feldman and Ehrenfeld individually, moved for dismissal as to them on three additional grounds: (a) there was no proof implicating them in the roof extension; (b) there was no access to the telephone equipment from their building; (c) they had no knowledge of the defective structure at the time of their purchase.

the entrant was a trespasser, licensee or invitee (see, e.g., *Heskell v Auburn Light, Heat & Power Co.*, 209 NY 86).

Plaintiff Beedenbender was a policeman who, in the performance of his duties, was injured, stated most simply, when he fell off a make-shift fence between the defendants' properties. In reversing a judgment in favor of the plaintiff against the appellant landowners and ordering a new trial, the appellate court reasoned that Beedenbender was certainly not a trespasser, for he entered the premises rightfully, at the request of appellants' night watchman. Moreover, in the case of policemen and firemen, the consent of the property owner to enter was irrelevant in defining their status as either licensees or invitees. Hence, policemen and firemen were to be treated as a "special class, *sui generis*," owed a twofold duty by property owners, aside from any statutory duty owed *(Beedenbender v Midtown Props.*, 4 AD2d 276, 281, *supra)*. An owner was obliged to keep the customary and usual passageways used by all persons in safe condition; and an owner had a duty to warn persons, such as firemen or policemen, of a dangerous condition, if he knew of their presence and of the condition. "The owner owe[d] no duty to those privileged· to enter irrespective of consent to safeguard those parts of his property not ordinarily utilized for passage through the premises, or to discover potential dangers therein, for the entry thereon by such persons under unusual conditions at any hour of the day or night [was] not reasonably foreseeable" (pp 281-282).[5]

This type of analysis no longer engages the courts of this State. New York has since adopted a single standard of

---

5. PJI 2:93 expressed the *Beedenbender* rule as follows:

"Liability for Condition or Use of Land — Possessor's Liability — To Person Entering In Exercise of Privilege — Unusual Hazard.

"The (owner, possessor) of (land, a building) owes no duty to a (policeman, fireman, census taker) who comes upon the premises in the performance of his duties to safeguard those portions of the premises not customarily used for passage through the property nor as to such persons has he any duty to discover or correct possible dangers in the areas of the premises not customarily used for passage. However, if the (owner, possessor) knows that a dangerous condition exists on his premises and that a (policeman, fireman, census taker) is present on the premises and the (owner, possessor) has reason to believe that the (policeman, fireman, census taker) is unaware of the danger, the (owner, possessor) has a duty to warn the (policeman, fireman, census taker) of the dangerous condition and the risks it involves, provided there is a reasonable opportunity to do so." For an "update" of the instruction to bring it within the embrace of the single standard of reasonable care, see n 6, *infra*.

care owed by property owners to those who come upon the land, supplanting the multiple standards that were premised on the common-law distinctions among entrants (see *Basso v Miller,* 40 NY2d 233; *Scurti v City of New York,* 40 NY2d 433). The present standard requires that a landowner maintain his property as a reasonable person would, "in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk" *(Smith v Arbaugh's Rest.,* 469 F2d 97, 100, as quoted in *Basso v Miller, supra,* p 241). Whether liability will be imposed is thus a measure of foreseeability, i.e., liability is determined in part by "the likelihood of plaintiff's presence at the particular time and place of the injury" *(Basso v Miller, supra,* p 241). Under the present standard of reasonable care, the focus is upon the conduct of the landowner rather than, as before, upon the status of the plaintiff *(Quinlan v Cecchini,* 41 NY2d 686, 689).

Whether or not the *Beedenbender* rule, updated to eliminate references to status,[6] continues to have vitality as an instruction in cases involving policemen or firemen who arrive unexpectedly upon portions of premises not customarily used for passage, is a question not before us. What we hold is that the rule has no applicability to the present case where the likelihood of the presence of a telephone repairman should be considered as one among all the circumstances to be evaluated in a determination of what was reasonable care and whether a duty by the owners-possessors arose.

---

6. PJI 2:93 has been amended (Oct., 1980 Supp, pp 91-92) by deleting one phrase from the catchline and substituting another; by deleting the initial reference to policemen, firemen, or census takers who enter premises in the performance of their duties and substituting at other places the word "person" or "someone" for fireman, policeman or census taker. The instruction thus reads:

"Liability for Condition or Use of Land — Possessor's Liability — Unusual Hazard — Duty to Warn of Dangerous Condition in Areas Not Normally Used for Passage.

"The (owner, possessor) of (land, a building) owes no duty to safeguard those portions of the premises not customarily used for passage through the property nor has he any duty to discover or correct possible dangers in areas of the premises not customarily used for passage. However, if the (owner, possessor) knows that a dangerous condition exists on his premises and that someone is present on the premises and the (owner, possessor) has reason to believe that person is unaware of the danger, the (owner, possessor) has a duty to warn the person of the dangerous condition and the risks it involves, provided there is a reasonable opportunity to do so."

Underlying the *Beedenbender* rule and PJI 2:93 is the presumption that the entry of policemen and firemen "under unusual conditions at any hour of the day or night is not reasonably foreseeable" *(Beedenbender v Midtown Props.,* 4 AD2d 276, 282, *supra)*. However that may be, under the facts and circumstances of this case, a jury could find, under proper instructions respecting the reasonableness of defendants' conduct in maintaining their properties, that the presence of a telephone repairman was reasonably to be anticipated. Indeed, one of the important circumstances at issue on the evidence presented is the foreseeability or likelihood of the plaintiff telephone repairman's presence at the particular time and place of injury (see *Basso v Miller,* 40 NY2d 233, *supra)*. Hence, an instruction that states that no duty is owed by an owner to safeguard portions of the premises not customarily used for passage (PJI 2:93, Oct., 1980 Supp, pp 91-92),[7] fails to articulate adequately the standard of reasonable care applicable here. The instruction ignores the question of whether plaintiff's presence was reasonably foreseeable and focuses on the infrequency of use of the area of the accident. In determining the reasonableness of defendants' conduct, both factors should be considered.

The evidence was that a cable splice existed on the wall of 115 Chrystie Street and a terminable box at 139 Bowery Street since as early as 1948 and that on numerous occasions telephone men gained access to either or both by going onto the roof of 139 Bowery through a window of the building. Furthermore, there was evidence that significant alterations to the cable splice were undertaken by the telephone company in 1966 and that defendants Hochberg and Schwartz, who purchased the building in 1937, had undertaken both alterations and repairs implicating the roof area.

Thus, the nature of the evidence does not support an unvarying conclusion that the plaintiff's presence was singular and unusual, akin to the unexpected and unanticipated arrival upon the premises of policemen or firemen. Accordingly, it was error for the trial court to hold that the

---

7. PJI 2:93, as amended, is set forth at n 6, *supra*.

rule of *Beedenbender v Midtown Props. (supra)* contained in PJI 2:93 adequately expressed the duty owed.

The decision of the trial court to take the case from the jury was also error inasmuch as there were permissible inferences which could be drawn from the evidence. Where such inferences could lead rationally to a conclusion of negligence, the facts pose a question for resolution by the jury *(Nallan v Helmsley-Spear, Inc.,* 50 NY2d 507, 517). The trial court must determine, of course, in the first instance, whether the facts will support a negligence finding as a matter of law, and to that end "it may consider whether the foreseeability of the presence of an entrant on land is too remote, given the nature of the risk and the burdens that would be imposed on a landowner to guard against it" *(Quinlan v Cecchini,* 41 NY2d 686, 689, *supra).*

Tested by these considerations, the case should have been permitted to go to the jury. Given the length of time the cable splice and terminal box were located at defendants' buildings and the number of occasions upon which telephone repairmen were admitted to the roof, a jury could reasonably find that some duty was owed to plaintiff by the defendants, notwithstanding that the place of the accident was one not customarily used for passage. We emphasize that proper instructions would refer to the frequency or infrequency of the use of the roof area as a factor or circumstance to be considered by the jury in its evaluation of defendants' responsibility. On that point the defendants can show that "it would have been unduly burdensome [for them] to have done more" (see *Scurti v City of New York,* 40 NY2d 433, 442, *supra),* under all of the circumstances of this case, taking into consideration the probability and seriousness of foreseeable harm to others.

Since the conclusion to be drawn respecting the reasonableness of defendants' conduct was not unvarying, the question of the degree of care demanded in the situation should have been answered by the jury.

We address briefly the two remaining contentions. Whether defendants Ehrenfeld, Feldman and Chrystie Street Company are free of responsibility, as they contend,

should be determined upon the new trial. Although access to the roof extension or bridge was not by way of 115 Chrystie Street, proof on the question of notice was equivocal. If, upon the new trial, an issue is created concerning their lack of knowledge of the defects and of any responsibility for them, they may be entitled to an instruction in that regard (cf. *Bernawich v Fishbein Realty Corp.,* 242 App Div 351).

Whether or not the terms of the lease between fourth-party defendant Lady Lesley, Ltd. and defendants fourth-party plaintiffs Hochberg and Schwartz release Lady Lesley from liability and contribution to Hochberg and Schwartz is a question that must await the trial in the underlying action.

Accordingly, the judgment should be reversed, the complaint, third- and fourth-party complaints and cross claims reinstated, and a new trial granted.

HOPKINS, J. P., RABIN and COHALAN, JJ., concur.

Judgment of the Supreme Court, Kings County, entered June 6, 1980, reversed, on the law, the complaint, third- and fourth-party complaints and cross claims are reinstated, and a new trial is granted, with costs to abide the event. No findings of fact were presented for review.