WYATT KAHN, Appellant, v GATES CONSTRUCTION CORP. et al., Respondents; UNDERSEA SYSTEMS, INC., Third-Party Defendant-Respondent.

Second Department, October 9, 1984

APPEARANCES OF COUNSEL

*Mirabel, Wortman & Freidel* (*Norman Bard, Beth J. Goldmacher* and *Melvin D. Freidel* of counsel), for appellant.

*Frank B. Gass* for Gates Construction Corp. and another, respondents.

*A. Paul Goldblum* for County of Suffolk, respondent.

*Raymond C. Green* (*Shayne, Dachs, Stanisci & Corker* [*Norman H. Dachs* and *Gilbert Klaperman*] of counsel), for third-party defendant-respondent.

### OPINION OF THE COURT

O'CONNOR, J.

■■ On this appeal from a judgment dismissing plaintiff's complaint after the presentation of the plaintiff's case to the jury, the principal question is whether the plaintiff presented a prima facie case of common-law negligence, as well as violations of section 240 and subdivision 6 of section 241 of the Labor Law. Under the facts of this case, we answer the question in the affirmative. As a threshold issue, we also determine that the alleged applicability of maritime law does not affect the remedies available to and chosen by the plaintiff.

I

On June 16, 1978, plaintiff was a commercial diver employed by third-party defendant, Undersea Systems, Inc. (Undersea), a subcontractor of defendant Suffolk Marine Constructors (Marine). Marine was a joint venture comprised of several companies including defendant Gates Construction Corp. (Gates). Marine, as general contractor, was to construct an underwater outflow pipe for defendant Suffolk County (county). The pipe was to run two to three miles from the county's sewage facility out into the Atlantic Ocean where the effluent would be dispersed. Gates was the sole member of Marine to actively participate at the job site. Undersea was retained to do the underwater work necessary to join the several 600-foot steel and concrete pipe sections making up the sewage pipeline.

On the day of the accident, plaintiff and the crew were working on a section of pipe located approximately 2,800 feet (about one-half mile) offshore. They worked off a barge operated by Gates, which was positioned over the worksite and to which they were transported each day by tugboat. Immediately before the accident, plaintiff was underwater

near the section of pipe about to be permanently positioned adjacent to the portion of the pipeline already completed.

In order to align the pipe sections and safeguard the alignment once made, a crane located on the diving barge would first lift the pipe's end to its proper position, as measured from the bottom of a trench dug on the ocean floor. Then the divers would lock the pipe into position by placing sandbags or concrete blocks, called "chocks", into the trench beneath the pipe. Cables which ran from the crane were attached to the pipe in order to lift it. The divers affixed these lift cables to one of the two chokers that encircled the ends of each pipe. The chokers were about 30 inches in length and were made of wire cable, approximately one inch in diameter. The choker had two eyes on either end; one eye was slipped into the other forming a noose around the pipe. The unused eye was attached to the lift cable which, when raised, would tighten the choker around the pipe. A "down line" used to send equipment from the barge to the diver also had to be affixed to some point on the pipe.

At the time of the accident, the inshore end of the pipe (i.e., the end adjacent to the completed pipe line) had already been lifted into position. The divers had also filled in the space beneath this end of the pipe and the trench dug out in the ocean floor by fitting in the chocks. The pipe was thus at least partially lying on the bottom of the trench on the ocean floor. When plaintiff dove into the water, he was told to stand by while the crane lifted the offshore end of the pipe to the proper level, and then to place the chocks beneath the pipe at the offshore end. The crane would hold the pipe in place while plaintiff filled in this space. As per the instructions of Marine's and Gates' supervisor, Onnie Mitchel, plaintiff was then to begin fitting the chocks under the pipe from the offshore end working back towards the inshore end.

Plaintiff noted that on the day in question underwater visibility in the work area around the pipe was zero; he found the pipe by feeling with his hands and feet. Gary Parsons, the Undersea supervisor, testified that at the time of the accident there were four-foot swells which caused the barge to go up and down and the lifting line to

slacken and tighten. Part of the movement of the barge, according to Parsons, was due to the improper alignment of the barge over the work area; he complained about the barge's location to Marine's and Gates' site supervisor, but Mitchel refused to move the barge.

At trial, all witnesses conceded that just before the accident plaintiff was told to affix the down line to the same choker where the lifting cable was to be attached. Prior to attaching the down line, plaintiff objected over the communication system, asking whether the down line could be placed elsewhere, specifically on one of the floater balls firmly attached to the pipe approximately 10 feet from the choker. He expressed fears of getting caught in the pinch point between the choker and the pipe.

The response from the surface to plaintiff's request was that he either hook the down line to the choker or get out of the water. Thereupon, plaintiff hooked the down line to the choker on the offshore end of the pipe as instructed. He then got off the pipe, moved to the bottom of it, measured out approximately seven or eight feet from the choker and told the barge crew to raise the pipe. The pipe was then raised. As the pipe was raised, it started bouncing around, up and down and side to side. Plaintiff informed the barge crew that the pipe was bouncing. The surface crew told him, "Well, stay clear of things. We are going to be sending the chocks down pretty soon".

About three minutes after plaintiff had positioned himself next to the pipe, his feet on the ground, while he waited for the chocks which had not yet been sent down, he took his left hand off the pipe, felt something on the hand and tried unsuccessfully to pull his hand back. The hand was caught in the pinch point between the choker and the pipe, resulting in the loss of portions of three of his fingers.

At the close of plaintiff's case, defendants Gates and Marine moved to dismiss the complaint on the ground that plaintiff had not made out a prima facie case of common-law negligence and on the further ground that sections 240 and 241 of the Labor Law did not apply to the underwater activities in which the parties were engaged. Trial Term granted the motion in its entirety, dismissing the com-

plaint, cross claims and third-party claims. The court reasoned that plaintiff could have removed himself from the water if he believed the job was unsafe and in the end it was plaintiff who, by failing to heed the instructions to stand clear, caused the accident. Furthermore, the court held that the Labor Law did not apply to the type of activity undertaken by the parties and that the workplace was not shown to be unsafe. We disagree with Trial Term's analysis and accordingly reverse.

II

■ A threshold question to be answered is what effect the law of admiralty has on this case in view of the accident's occurrence on the ocean floor approximately one-half mile off the shore of Long Island. This issue was not clearly raised during the trial and was not ruled upon by Trial Term. Indeed, on appeal, the defendants county, Gates and Marine only raise this issue in passing, claiming that *somehow* the existence of maritime law defeats plaintiff's common-law negligence and New York State Labor Law claims. We conclude, in any event, that the law of admiralty has no effect on plaintiff's claim and that even were this action to be decided in admiralty (an issue on which the court need not conclusively pass, particularly as it was only cursorily raised for the first time on appeal), plaintiff's claims would still be viable.

As has often been stated, admiralty jurisdiction extends to those cases of damage or injury on navigable waters where the accident bears a significant relationship to traditional maritime activity (see *Foremost Ins. Co. v Richardson,* 457 US 668; *Executive Jet Aviation v City of Cleveland,* 409 US 249; *Scholl v Town of Babylon,* 95 AD2d 475; US Code, tit 28, § 1333). While no one would deny that Long Island Sound, one-half mile from shore, is navigable, the precise question here is whether the accident occurred *on navigable waters.* It was uncontested at bar that the injury took place, and the alleged unsafe workplace existed, *on the ocean bottom, beneath the navigable waters,* one-half mile from the shore. Furthermore, the Submerged Lands Act (US Code, tit 43, § 1301, subd [a], par [2]) specifically grants a State sovereignty over "all lands permanently or periodically covered by tidal waters up to

but not above the line of mean high tide and seaward to a line three geographical miles distant from the coast line of each such State and to the boundary line of each such State where in any case such boundary as it existed at the time such State became a member of the Union, or as heretofore approved by Congress, extends seaward (or into the Gulf of Mexico) beyond three geographical miles". Since the alleged tort took place on land over which New York State exercised sovereignty, Federal law would not be applicable (see *California ex rel. State Lands Comm. v United States,* 457 US 273, 283, reh den 458 US 1131; *United States v Alaska,* 422 US 184, 187, reh den 423 US 885). Accordingly, we are of the opinion that under the facts presented in this case, admiralty jurisdiction is not invocable and should not be applied. Indeed, in *Sullivan v Booth & Flinn* (210 App Div 347, 350), this court held that admiralty jurisdiction is not applicable to a claim based upon decedent's death while working on land beneath the Hudson River during the construction of a tunnel, specifically pointing out that "the land under the water of the Hudson river does not belong to the Federal government".[1]

Even assuming, *arguendo,* that admiralty jurisdiction were applicable to the case at bar, plaintiff's substantive remedies would not be affected. As this court recently noted in *Scholl v Town of Babylon* (*supra,* p 481): "While Federal courts have primary jurisdiction over maritime torts, under the 'saving to suitors' clause of the statute conferring admiralty jurisdiction, State courts have concurrent jurisdiction of tort actions in personam, except in those cases where exclusive jurisdiction has been conferred upon the Federal courts (*Messel v Foundation Co.,* 274 US 427; *Kellog & Sons v Hicks,* 285 US 502; US Code, tit 28, § 1333, subd [1]; 2 CJS, Admiralty, §§ 13, 69). In general, if a tort is a maritime tort cognizable in admiralty, maritime law governs with respect to the rights and liabilities of the parties regardless of whether the action is brought in a

1. The Admiralty Jurisdiction Extension Act (US Code, tit 46, § 740) is not in conflict with this holding. The purpose of that act was to prevent individuals from falling through the cracks of State law jurisdiction and admiralty jurisdiction (see *State v S.S. Bournemouth,* 307 F Supp 922; cf. *Sun Ship v Pennsylvania,* 447 US 715, reh den 448 US 916 [State workers' compensation scheme may be applied to injuries which fall within the coverage of the Longshoremen's and Harbor Workers' Compensation Act (US Code, tit 33, § 901 *et seq.*)]).

state or Federal court (*Carlisle Packing Co. v Sandanger,* 259 US 255; *Chelentis v Luckenbach S.S. Co.,* 247 US 372; 2 CJS, Admiralty, § 70)." Since Federal tort law is limited, however, the substantive law applied by the State or Federal court sitting in admiralty is based upon State law (see *Gulf Offshore Co. v Mobil Oil Corp.,* 453 US 473; *Rodrigue v Aetna Cas. Co.,* 395 US 352; cf. *Scholl v Town of Babylon, supra*). Thus, plaintiff's common-law negligence cause of action would be viable even if Trial Term decided this case as a matter of admiralty law.

In similar fashion, plaintiff's Labor Law claims would also still be viable. As previously noted, the injury in question occurred on land beneath navigable waters. As such, it took place on State-controlled land (US Code, tit 43, § 1301). Accidents in this realm are specifically excluded from coverage under the safe workplace provisions of the Longshoremen's and Harbor Workers' Compensation Act (US Code, tit 33, § 941, subd [g], par [1]) and the Outer Continental Shelf Lands Act (US Code, tit 43, § 1331 *et seq.*). Federal maritime laws simply do not provide safe workplace coverage for an accident which occurs on State land beneath navigable waters. In the same way that courts sitting in admiralty prior to *Moragne v States Mar. Lines* (398 US 375, 393)[2] borrowed a State's substantive statutory remedy of wrongful death if the maritime tort resulting in death was committed on navigable waters within said State, since admiralty possessed no such remedy (see *Western Fuel Co. v Garcia,* 257 US 233; see, also, *Hess v United States,* 361 US 314; *The Tungus v Skovgaard,* 358 US 588; *United Pilots Assn. v Halecki,* 358 US 613), an admiralty court (here a New York State court) would apply the pertinent State remedy provided by the State's safe workplace laws since admiralty does not provide such a remedy for the particular site of the injury. Therefore, New York State's safe workplace statutes (Labor Law, §§ 240, 241) would also be available remedies to plaintiff even if Trial Term were sitting as an admiralty court.

---

**2.** Prior to *Moragne v States Mar. Lines* (398 US 375), it was held that admiralty itself conferred no right of action for wrongful death (*The Harrisburg,* 119 US 199). *Moragne* specifically overruled *The Harrisburg.*

## III

Turning to the main contention on appeal, to wit, the propriety of dismissing the complaint, it has often been noted that on a motion to dismiss for failure to establish a prima facie case, the test is not whether a plaintiff's verdict would have been set aside as contrary to the weight of the credible evidence, but whether the jury could find for the plaintiff by any rational process (see *Rhabb v New York City Housing Auth.,* 41 NY2d 200; *Santiago v Steinway Trucking,* 97 AD2d 753; *Tolley v Dogleg Realty Co.,* 89 AD2d 602; *Monahan v Weichert,* 82 AD2d 102). Where permissible inferences drawn from the evidence could rationally lead to a conclusion that defendant was negligent, the facts pose a question for the jury to resolve (see *McArdle v M & M Farms of New City,* 90 AD2d 538, app dsmd 58 NY2d 972; *Fiederlein v Hochberg Bros.,* 83 AD2d 472, 479; see, also, *Maresca v Lake Motors,* 32 AD2d 533, 534-535, affd 25 NY2d 716; *Eddy v Syracuse Univ.,* 78 AD2d 989, 990; *Archie v Todd Shipyards Corp.,* 65 AD2d 699, 700). While there can be no liability for a negligent act unless there was a "reasonable likelihood of danger as a consequence of the act complained of" (*O'Neill v City of Port Jervis,* 253 NY 423, 433, paraphrasing *Palsgraf v Long Is. R. R. Co.,* 248 NY 339), the issue of foreseeability is also for the jury to resolve when varying inferences may be drawn from the facts (see *Juiditta v Bethlehem Steel Corp.,* 75 AD2d 126, 135; see, also, *Parvi v City of Kingston,* 41 NY2d 553, 560; *Snyder v Moore,* 72 AD2d 580, 581). Furthermore, as stated in *Derdiarian v Felix Contr. Corp.* (51 NY2d 308, 315), "[t]o carry the burden of proving a prima facie case, the plaintiff must generally show that the defendant's negligence was a substantial cause of the events which produced the injury * * * Plaintiff need not demonstrate, however, that the precise manner in which the accident happened, or the extent of injuries, was foreseeable" (see, also, *Mack v Altmans Stage Light. Co.,* 98 AD2d 468; *Snyder v Moore, supra*).

■ In the present case, plaintiff has indeed met his burden of presenting a prima facie case of common-law negligence. At trial, he elicited testimony that employees of Gates and Marine instructed him to attach the down line

to the choker cable, which was around the outfall pipe, and that he objected to attaching the down line at this point since he would thus be positioned near the pinch point between the pipe and the choker and subject to injury. Moreover, Parsons, plaintiff's direct supervisor and an expert diver, testified that the placement of the down line on the choker was not proper procedure, since a diver could get his air hose or limbs ensnared in the cable (choker) as it alternately slackened and tightened around the pipe. As previously noted, when the Gates' and Marine's supervisor denied plaintiff's request to place the down line elsewhere on the pipe (at least 10 feet from the choker), plaintiff hooked the down line to the choker as instructed. Plaintiff moved approximately seven to eight feet from the choker and down line and told the surface crew to raise the pipe. When the surface crew was advised of the pipe's bouncing movement they told plaintiff to await supplies but stand clear. Thereafter, the choker cable caught plaintiff's hand and crushed portions of three fingers on his left hand. After the accident, the job was completed with the down line in the position that plaintiff had previously requested.

Clearly, plaintiff has presented evidence that it was improper to place a down line on the choker owing to a danger of the very type of injury which occurred. It is evident that if he had been allowed to place the down line at the location he desired, he would have been at least two feet farther away from the slackening and tightening choker, which indisputedly caused the injury. Viewing the evidence in the light most favorable to plaintiff, as we must, a jury could rationally find that the placement of the down line on the choker under orders of Gates' and Marine's supervisor placed plaintiff in a position close enough to the choker to be ensnared in its movements, and was the proximate cause of the injury. Consequently, the cause of action for common-law negligence should not have been dismissed. Any evidence of plaintiff's own negligence would not defeat his prima facie case but would, of course, be submitted to the jury for their resolution on the question of comparative liability.

Turning to plaintiff's cause of action under sections 240 and 241 of the Labor Law,[3] here, too, Trial Term improperly dismissed the claims. It is clear that the down line which served to safely transport the equipment from the surface down to the work site is a device within the meaning of section 240 of the Labor Law (see *Ploof v B.I.M. Truck Serv.,* 53 AD2d 750, mot for lv to app den *sub nom. Ploof v Lane Constr. Co.,* 40 NY2d 803 [cable used to load or unload items is a device within the purview of section 240 of the Labor Law]). Moreover, a pipeline from a sewer plant to the sea would be a structure under the Labor Law's liberal interpretation (see *Keefner v City of Albany,* 77 AD2d 747, mot for lv to app den 52 NY2d 704). The courts have traditionally held section 240 applicable to nonbuilding sites (see *Armenti v Brooklyn Union Gas Co.,* 157 App Div 276 [work beneath the streets]; *Stevens v Stanton Constr. Co.,* 153 App Div 82 [work beneath the streets]; *Herman v Fitzgibbons Boiler Co.,* 136 App Div 286 [work on side of a ship]; *Madden v Hughes,* 104 App Div 101, affd 185 NY 466 [work on scows]). Thus, it was a jury question as to whether section 240 of the Labor Law was actually violated by the placement of the down line on the choker and whether such violation was the proximate cause of plaintiff's injuries (see *Ryan v Cenci,* 95 AD2d 963; see, also, *Smith v Hooker Chems. & Plastics Corp.,* 89 AD2d 361, app dsmd 58 NY2d 824). Pursuant to the statute, the county, as owner of the outfall pipe, and codefendants, as contractors, could all be held absolutely liable even if they did not supervise or control the work area (see *Long v*

---

**3.** These sections provide in pertinent part:

"§ 240. Scaffolding and other devices for use of employees

"1. All contractors and owners and their agents * * * in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed".

"§ 241. Construction, excavation and demolition work

"All contractors and owners and their agents * * * when constructing or demolishing buildings or doing any excavating in connection therewith, shall comply with the following requirements * * *

"6. All areas in which construction, excavation or demolition work is being performed shall be so constructed, shored, equipped, guarded, arranged, operated and conducted as to provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places. The board may make rules to carry into effect the provisions of this subdivision, and the owners and contractors and their agents for such work * * * shall comply therewith."

*Forest-Fehlhaber,* 55 NY2d 154, 159; *Crawford v Leimzider,* 100 AD2d 568; *Mack v Altmans Stage Light. Co.,* 98 AD2d 468, *supra; Monroe v City of New York,* 67 AD2d 89).

Furthermore, the trial court erred in its determination that subdivision 6 of section 241 of the Labor Law did not apply to the case at bar. This court has held that the statute is to be applied liberally in its scope of coverage (see *Celestine v City of New York,* 86 AD2d 592, affd 59 NY2d 938 on opn at App Div). In *Celestine v City of New York* (*supra,* p 593), this court wrote: "The purpose of the 1969 amendment to section 241 of the Labor Law was to impose a nondelegable duty upon owners and general contractors to provide reasonable and adequate protection and safety to persons employed in construction, excavation or demolition work, regardless of the absence of control, supervision or direction of the work (*Allen v Cloutier Constr. Corp.,* 44 NY2d 290). Liability arises out of the duties referred to in section 241 and may not be escaped by delegation. (*Page v LaBuzzetta,* 73 AD2d 483, 484.) Although the construction was not in connection with a 'building', in the narrow sense of that word, we concur with the interpretation of this section by the Fourth Department in *Tilkins v City of Niagara Falls* (52 AD2d 306) and the Third Department in *Page v State of New York* (73 AD2d 479), which concluded that subdivision 6 of section 241 of the Labor Law is not limited to building sites". This court has on at least one other occasion explained the level of responsibility required by subdivision 6 of section 241 of the Labor Law in the following terms: "We therefore construe subdivision 6 of section 241 of the Labor Law to impose a nondelegable duty upon owners and contractors to vicariously respond in damages for injuries sustained due to the negligence of general contractors or subcontractors in failing to conduct their construction, demolition or excavation operations so as to provide for the reasonable and adequate protection of the persons employed therein. Such a construction has the salutary effect of preserving the issue of the breach of the statute for resolution by a jury" (*Monroe v City of New York,* 67 AD2d 89, 107-108, *supra*). Thus, all the defendants could be held chargeable with liability, and the construction of the outfall pipe would be covered by subdi-

vision 6 (see, also, *Ackley v Vitale Bros. Contrs.,* 80 AD2d 989). Having presented his case calling into question the safety of the construction operations (to wit, the alleged improper placement of the down line), plaintiff has also made out a case sufficient to go to the jury pursuant to subdivision 6 of section 241 of the Labor Law.

In light of the foregoing, the judgment appealed from must be reversed and a new trial granted as to all parties.

MOLLEN, P. J., TITONE and WEINSTEIN, JJ., concur.

Judgment of the Supreme Court, Suffolk County, entered June 25, 1982, reversed, on the law, and new trial granted as to all parties, with costs to abide the event.