## SISSON *v.* RUBY ET AL.

No. 88–2041.   Argued April 23, 1990—Decided June 25, 1990

MARSHALL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, BLACKMUN, STEVENS, O'CONNOR, and KENNEDY, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, in which WHITE, J., joined, *post*, p. 368.

*Warren J. Marwedel* argued the cause for petitioner. With him on the briefs was *Dennis Minichello*.

*Robert J. Kopka* argued the cause for respondents. With him on the brief was *Jeffrey S. Herden*.*

JUSTICE MARSHALL delivered the opinion of the Court.

We must decide whether 28 U. S. C. § 1333(1), which grants federal district courts jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction," confers federal jurisdiction over petitioner's limitation of liability suit brought in connection with a fire on his vessel. We hold that it does.[1]

---

*Briefs of *amici curiae* urging reversal were filed for American Auto, Inc., by *Terence S. Cox;* and for the Maritime Law Association of the United States by *Richard H. Brown, Jr.*, and *Richard W. Palmer*.

*John A. Flynn* filed a brief for the Hatteras Yachts Division of Genmar Industries, Inc., as *amicus curiae* urging affirmance.

*Solicitor General Starr, Deputy Solicitor General Shapiro*, and *Stephen L. Nightingale* filed a brief for the United States as *amicus curiae*.

[1] Sisson has also argued throughout this litigation that the Limited Liability Act, Rev. Stat. § 4281 *et seq.*, 46 U. S. C. App. § 181 *et seq.* (1982 ed., Supp. V), provides an independent basis for federal jurisdiction. Respondents contend that the Act does not create jurisdiction, but instead may be invoked only in cases otherwise within the maritime jurisdiction of § 1333(1). We need not decide which party is correct, for even were we to agree that the Limited Liability Act does not independently provide a basis for this action, § 1333(1) is sufficient to confer jurisdiction. Petitioner also argues that the Admiralty Extension Act, 62 Stat. 496, 46 U. S. C. App.

Everett Sisson was the owner of the *Ultorian,* a 56-foot pleasure yacht. On September 24, 1985, while the *Ultorian* was docked at a marina on Lake Michigan, a navigable waterway, a fire erupted in the area of the vessel's washer/dryer unit. The fire destroyed the *Ultorian* and damaged several neighboring vessels and the marina. In the wake of the fire, respondents filed claims against Sisson for over $275,000 for damages to the marina and the other vessels. Invoking the provision of the Limited Liability Act that limits the liability of an owner of a vessel for any damage done "without the privity or knowledge of such owner" to the value of the vessel and its freight, 46 U. S. C. App. § 183(a) (1982 ed., Supp. V), Sisson filed a petition for declaratory and injunctive relief in Federal District Court to limit his liability to $800, the salvage value of the *Ultorian* after the fire. Sisson argued that the federal court had maritime jurisdiction over his limitation of liability action pursuant to § 1333(1). The District Court disagreed, dismissing the petition for lack of subject-matter jurisdiction. *In re Complaint of Sisson,* 663 F. Supp. 858 (ND Ill. 1987). Sisson sought reconsideration on the ground that the Limited Liability Act independently conferred jurisdiction over the action. The District Court denied Sisson's motion, both on the merits and on the basis of Sisson's failure to raise the argument before the dismissal of the action. *In re Complaint of Sisson,* 668 F. Supp. 1196 (ND Ill. 1987). The Court of Appeals for the Seventh Circuit affirmed, holding that neither § 1333(1) nor the Limited Liability Act conferred jurisdiction. *In re Complaint of Sisson,* 867 F. 2d 341 (1989). We granted certiorari, 493 U. S. 1055 (1990), and now reverse.

Until recently, § 1333(1) jurisdiction over tort actions was determined largely by the application of a "locality" test. As this Court stated the test in *The Plymouth,* 3 Wall. 20,

---

§ 740 (1982 ed., Supp. V), provides an independent basis for jurisdiction. We decline to consider that argument because it was not raised below.

36 (1866): "Every species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters, is of admiralty cognizance." See also *Executive Jet Aviation, Inc.* v. *City of Cleveland*, 409 U. S. 249, 253–254 (1972) (describing the locality test). *Executive Jet* marked this Court's first clear departure from the strict locality test. There, a jet aircraft struck a flock of sea gulls while taking off, lost power, and crashed into the navigable waters of Lake Erie, which lay just past the end of the runway. The owner of the aircraft sued the city of Cleveland, the owner of the airport, in federal court, arguing that § 1333(1) conferred federal jurisdiction over the action. Noting "serious difficulties with the locality test," *id.*, at 255, we refused to enter into a debate over whether the tort occurred where the plane had crashed and been destroyed (the navigable waters of Lake Erie) or where it had struck the sea gulls (over land), *id.*, at 266–267. Rather, we held that jurisdiction was lacking because "the wrong [did not] bear a significant relationship to traditional maritime activity." *Id.*, at 268.

Although our holding in *Executive Jet* was limited by its terms to cases involving aviation torts, that case's "thorough discussion of the theoretical and practical problems inherent in broadly applying the traditional locality rule . . . prompted several courts and commentators to construe *Executive Jet* as applying to determinations of federal admiralty jurisdiction outside the context of aviation torts." *Foremost Ins. Co.* v. *Richardson*, 457 U. S. 668, 673 (1982). In *Foremost*, we approved this broader interpretation of *Executive Jet*. 457 U. S., at 673. *Foremost* involved a collision, on what we assumed to be navigable waters, *id.*, at 670, n. 2, between an 18-foot pleasure boat and a 16-foot recreational fishing boat, see *Richardson* v. *Foremost Ins. Co.*, 470 F. Supp. 699, 700 (MD La. 1979). Neither vessel had ever been engaged in any commercial maritime activity. 457 U. S., at 670–671.

We began our application of *Executive Jet* by rejecting "petitioners' argument that a substantial relationship with *commercial* maritime activity is necessary" to a finding of maritime jurisdiction. 457 U. S., at 674 (emphasis added). Although we recognized that protecting commercial shipping is at the heart of admiralty jurisdiction, we also noted that that interest

> "cannot be adequately served if admiralty jurisdiction is restricted to those individuals actually *engaged* in commercial maritime activity. This interest can be fully vindicated only if *all* operators of vessels on navigable waters are subject to uniform rules of conduct. The failure to recognize the breadth of this federal interest ignores the potential effect of noncommercial maritime activity on maritime commerce. . . . The potential disruptive impact of a collision between boats on navigable waters, when coupled with the traditional concern that admiralty law holds for navigation, compels the conclusion that this collision between two pleasure boats on navigable waters has a significant relationship with maritime commerce." *Id.*, at 674–675 (footnote omitted).

In a footnote to the above passage, we noted that "[n]ot every accident in navigable waters that might disrupt maritime commerce will support federal admiralty jurisdiction," *id.*, at 675, n. 5 (citing *Executive Jet*), but that when a "potential hazard to maritime commerce arises out of activity that bears a substantial relationship to traditional maritime activity, as does the navigation of boats in this case, admiralty jurisdiction is appropriate." 457 U. S., at 675, n. 5. This case involves a fire that began on a noncommercial vessel at a marina located on a navigable waterway. Certainly, such a fire has a potentially disruptive impact on maritime commerce, as it can spread to nearby commercial vessels or make the marina inaccessible to such vessels. Indeed, fire is one of the most significant hazards facing commercial vessels.

See, *e. g.*, *Southport Fisheries, Inc.* v. *Saskatchewan Govt. Ins. Office*, 161 F. Supp. 81, 83–84 (EDNC 1958).

Respondents' only argument to the contrary is that the potential effect on maritime commerce in this case was minimal because no commercial vessels happened to be docked at the marina when the fire occurred. This argument misunderstands the nature of our inquiry. We determine the potential impact of a given type of incident by examining its general character. The jurisdictional inquiry does not turn on the *actual* effects on maritime commerce of the fire on Sisson's vessel; nor does it turn on the particular facts of the incident in this case, such as the source of the fire or the specific location of the yacht at the marina, that may have rendered the fire on the *Ultorian* more or less likely to disrupt commercial activity. Rather, a court must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity. Here, the general features—a fire on a vessel docked at a marina on navigable waters—plainly satisfy the requirement of potential disruption to commercial maritime activity.

Our approach here comports with the way in which we characterized the potential disruption of the types of incidents involved in *Executive Jet* and *Foremost*. This first aspect of the jurisdictional test was satisfied in *Executive Jet* because "an aircraft sinking in the water could create a hazard for the navigation of commercial vessels in the vicinity." *Foremost*, 457 U. S., at 675, n. 5. Likewise, in *Foremost* the Court noted "[t]he potential[ly] disruptive impact of a collision between boats on navigable waters." *Id.*, at 675. Indeed, we supported our finding of potential disruption there with a description of the likely effects of a collision at the mouth of the St. Lawrence Seaway, *ibid.*, an area heavily traveled by commercial vessels, even though the place where the collision actually had occurred apparently was "seldom, if ever, used for commercial traffic," *id.*, at 670, n. 2. Our

cases thus lead us to eschew the fact-specific jurisdictional inquiry urged on us by respondents.[2]

We now turn to the second half of the *Foremost* test, under which the party seeking to invoke maritime jurisdiction must show a substantial relationship between the activity giving rise to the incident and traditional maritime activity. As a first step, we must define the relevant activity in this case. Our cases have made clear that the relevant "activity" is defined not by the particular circumstances of the incident, but by the general conduct from which the incident arose. In *Executive Jet*, for example, the relevant activity was not a plane sinking in Lake Erie, but air travel generally. 409 U. S., at 269–270. See also *Foremost, supra*, at 675–677 (relevant activity is navigation of vessels generally). This

---

[2] JUSTICE SCALIA argues that we should abandon the requirement that the incident have the potential for disrupting maritime commerce. He argues that, "as a practical matter, *every* tort occurring on a vessel in navigable waters" should give rise to maritime jurisdiction, *post*, at 373 (emphasis added), no matter how divorced the incident from the purposes that give rise to such jurisdiction. JUSTICE SCALIA is correct that his approach would be simpler to apply than the one embraced by *Executive Jet* and *Foremost* and that, all things being equal, simpler jurisdictional formulae are to be preferred. Such a preference, in fact, informs our refusal to consider the particulars of the fire on the *Ultorian* in determining whether maritime jurisdiction lies. See *supra*, at 363. But the demand for tidy rules can go too far, and when that demand entirely divorces the jurisdictional inquiry from the purposes that support the exercise of jurisdiction, it *has* gone too far. In *Foremost*, the Court unanimously agreed that the purpose underlying the existence of federal maritime jurisdiction is the federal interest in the protection of maritime commerce, and that a case must implicate that interest to give rise to such jurisdiction. Compare *Foremost*, 457 U. S., at 674–675, with *id.*, at 679–680 (Powell, J., dissenting). The only point of debate in *Foremost* was whether the Court was straying too *far* from that purpose by requiring no more than that the wrong have a potentially disruptive impact on maritime commerce and arise from an activity with a substantial relationship to traditional maritime activity. JUSTICE SCALIA's view that *Foremost* did not go far *enough* is thus plainly inconsistent with the unanimous view of the Court in *Foremost*.

focus on the general character of the activity is, indeed, suggested by the nature of the jurisdictional inquiry. Were courts required to focus more particularly on the causes of the harm, they would have to decide to some extent the merits of the causation issue to answer the legally and analytically antecedent jurisdictional question. Thus, in this case, we need not ascertain the precise cause of the fire to determine what "activity" Sisson was engaged in; rather, the relevant activity was the storage and maintenance of a vessel at a marina on navigable waters.[3]

Our final inquiry, then, is whether the storage and maintenance of a boat at a marina on navigable waters has a substantial relationship to a "traditional maritime activity" within the meaning of *Executive Jet* and *Foremost*.[4] Re-

---

[3] In this case, all of the instrumentalities involved in the incident were engaged in a similar activity. The *Ultorian* and the other craft damaged by the fire were docked at a marina, and the marina itself provided docking and related services. The facts of *Executive Jet* and *Foremost* also reveal that all the relevant entities were engaged in a common form of activity. See *Executive Jet Aviation, Inc.* v. *City of Cleveland*, 409 U. S. 249 (1972) (entities involved in the incident were engaged in nonmaritime activity of facilitating air travel); *Foremost Ins. Co.* v. *Richardson*, 457 U. S. 668 (1982) (entities were both engaged in navigation). Different issues may be raised by a case in which one of the instrumentalities is engaged in a traditional maritime activity, but the other is not. Our resolution of such issues awaits a case that squarely raises them.

[4] The Circuits have interpreted this aspect of the jurisdictional inquiry variously. After *Executive Jet*, but before *Foremost*, the Fifth Circuit adopted a four-factor test for deciding whether an activity is substantially related to traditional maritime activity. The factors are "the functions and roles of the parties; the types of vehicles and instrumentalities involved; the causation and the type of injury; and traditional concepts of the role of admiralty law." *Kelly* v. *Smith*, 485 F. 2d 520, 525 (1973). In other Circuits, this test has continued to dominate the landscape even in the wake of *Foremost*. See, *e. g.*, *Drake* v. *Raymark Industries, Inc.*, 772 F. 2d 1007, 1015 (CA1 1985); *Guidry* v. *Durkin*, 834 F. 2d 1465, 1471 (CA9 1987); *Lewis Charters, Inc.* v. *Huckins Yacht Corp.*, 871 F. 2d 1046, 1051 (CA11 1989). The Fourth Circuit appears to follow *Kelly* as well, although how closely is unclear. Compare *Oman* v. *Johns-Manville Corp.*,

spondents would have us hold that, at least in the context of noncommercial activity, only navigation can be characterized as substantially related to traditional maritime activity. We decline to do so. In *Foremost,* we identified navigation as an example, rather than as the sole instance, of conduct that is substantially related to traditional maritime activity. See 457 U. S., at 675, n. 5. Indeed, had we intended to sug-

---

764 F. 2d 224, 230, and n. 3 (CA4 1985) (en banc) (stating that "a thorough analysis of the nexus requirement should include a consideration of *at least* [the *Kelly* factors]") (emphasis added), with *Bubla* v. *Bradshaw,* 795 F. 2d 349, 351 (CA4 1986) (implicitly treating *Kelly* factors as exclusive). The precise state of the law in the Fifth Circuit after *Foremost* is also unclear. Compare *Mollett* v. *Penrod Drilling Co.,* 826 F. 2d 1419, 1426 (CA5 1987) *(Mollett I)* (applying, in addition to the *Kelly* factors, "(1) the impact of the event on maritime shipping and commerce (2) the desirability of a uniform national rule to apply to such matters and (3) the need for admiralty 'expertise' in the trial and decision of the case"), with *Mollett* v. *Penrod Drilling Co.,* 872 F. 2d 1221, 1224–1226 (CA5 1989) *(Mollett II)* (applying the *Kelly* factors without explicit mention of the extra factors identified in *Mollett I).*

Other Circuits have adopted different approaches. The Seventh Circuit in this case held that an activity must either be commercial or involve navigation to satisfy the "traditional maritime activity" standard. *In re Complaint of Sisson,* 867 F. 2d 341, 345 (1989). The Second Circuit directly applies our language requiring a substantial relationship to traditional maritime activity without applying any additional factors. See *Keene Corp.* v. *United States,* 700 F. 2d·836, 844 (1983); *Kelly* v. *United States,* 531 F. 2d 1144, 1147–1148 (1976). Finally, the Sixth Circuit has criticized the Seventh Circuit's analysis in this case as "an indefensibly narrow reading of *Foremost Insurance,*" *In re Young,* 872 F. 2d 176, 178–179, n. 4 (1989), but has not set forth in concrete terms the test it would apply, cf. *Petersen* v. *Chesapeake & Ohio R. Co.,* 784 F. 2d 732, 736 (1986).

The parties and various *amici* suggest that we resolve this dispute by adopting one of the Circuits' tests (or some other test entirely). We believe that, at least in cases in which all of the relevant entities are engaged in similar types of activity (cf. n. 3, *supra*), the formula initially suggested by *Executive Jet* and more fully refined in *Foremost* and in this case provides appropriate and sufficient guidance to the federal courts. We therefore decline the invitation to use this case to refine further the test we have developed.

gest that navigation is the only activity that is sufficient to confer jurisdiction, we could have stated the jurisdictional test much more clearly and economically by stating that maritime jurisdiction over torts is limited to torts in which the vessels are in "navigation." Moreover, a narrow focus on navigation would not serve the federal policies that underlie our jurisdictional test. The fundamental interest giving rise to maritime jurisdiction is "the protection of maritime commerce," *id.*, at 674, and we have said that that interest cannot be fully vindicated unless "*all* operators of vessels on navigable waters are subject to uniform rules of conduct," *id.*, at 675. The need for uniform rules of maritime conduct and liability is not limited to navigation, but extends at least to any other activities traditionally undertaken by vessels, commercial or noncommercial.

Clearly, the storage and maintenance of a vessel at a marina on navigable waters is substantially related to "traditional maritime activity" given the broad perspective demanded by the second aspect of the test. Docking a vessel at a marina on a navigable waterway is a common, if not indispensable, maritime activity. At such a marina, vessels are stored for an extended period, docked to obtain fuel or supplies, and moved into and out of navigation. Indeed, most maritime voyages begin and end with the docking of the craft at a marina. We therefore conclude that, just as navigation, storing and maintaining a vessel at a marina on a navigable waterway is substantially related to traditional maritime activity.

For the foregoing reasons, we conclude that the District Court has jurisdiction over Sisson's limitation claim pursuant to § 1333(1). Neither the District Court nor the Court of Appeals has addressed the merits of Sisson's claim, and we therefore intimate no view on that matter. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE SCALIA, with whom JUSTICE WHITE joins, concurring in the judgment.

I agree that the District Court has jurisdiction over this case under 28 U. S. C. § 1333(1),[1] but I do not agree with the test the Court applies to conclude that this is so. Prior to *Foremost Ins. Co. v. Richardson*, 457 U. S. 668 (1982), our clear case law extended admiralty jurisdiction to all torts involving vessels on navigable waters. *Foremost* recited as applicable to such torts the test of "significant relationship to traditional maritime activity," which had been devised 10 years earlier for torts *not* involving vessels, see *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U. S. 249, 268 (1972). In my view that test does not add any new substantive requirement for vessel-related torts, but merely explains *why all* vessel-related torts (which *ipso facto* have such a "significant relationship"), but only *some* non-vessel-related torts, come within § 1333(1). The Court's description of how one goes about determining whether a vessel-related tort meets the "significant relationship" test threatens to sow confusion in what had been, except at the margins, a settled area of the law.

In *The Plymouth*, 3 Wall. 20, 36 (1866), we stated that "[e]very species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters, is of admiralty cognizance." Despite that passage, however, we held in *Executive Jet Aviation, Inc. v. City of Cleveland, supra,* that a tort action involving the crash of a jet aircraft in Lake Erie was not a "civil case of admiralty or maritime jurisdiction" within the meaning of § 1333(1), even assuming the accident could be regarded as having "occurred" on navigable waters. We acknowledged the tradi-

---

[1] Like the Court, because I conclude that the claims sought to be pursued against petitioner are maritime in nature, I do not reach the question whether, if jurisdiction did not exist on that basis, there would exist an independent basis for jurisdiction under the provisions of the Limited Liability Act, 46 U. S. C. App. § 181 *et seq.* (1982 ed., Supp. V).

tional rule as set forth in *The Plymouth*, but thought it significant that this "strict locality" test "was established and grew up in an era when it was difficult to conceive of a tortious occurrence on navigable waters other than in connection with a waterborne vessel." 409 U. S., at 254. Whereas where vessels were involved the test tended properly to capture only those cases that had been the traditional business of the admiralty courts, in other contexts it had produced "perverse and casuistic borderline situations" in which "the invocation of admiralty jurisdiction seem[ed] almost absurd." *Id.*, at 255.

> "If a swimmer at a public beach is injured by another swimmer or by a submerged object on the bottom, or if a piece of machinery sustains water damage from being dropped into a harbor by a land-based crane, a literal application of the locality test invokes not only the jurisdiction of the federal courts, but the full panoply of the substantive admiralty law as well. In cases such as these, some courts have adhered to a mechanical application of the strict locality rule and have sustained admiralty jurisdiction despite the lack of any connection between the wrong and traditional forms of maritime commerce and navigation." *Id.*, at 255–256.

We noted the general criticism of these cases, and pointed out the particular difficulties that had arisen from efforts to apply a "locality-alone" test to cases involving airplane crashes. Accordingly, we interpreted § 1333(1) to require, in the case of torts involving aircraft, not only that the *Plymouth* "locality" requirement be met, but also that "the wrong bear a significant relationship to traditional maritime activity," *Executive Jet*, 409 U. S., at 268. We concluded that wrongs in connection with "flights by land-based aircraft between points within the continental United States," *id.*, at 274, did not meet this test.

Our decision in *Executive Jet* could be understood as resting on the quite simple ground that the tort did not involve a

vessel, which had traditionally been thought required by the leading scholars in the field (notwithstanding the contrary dictum in *The Plymouth*). See E. Benedict, American Admiralty: Its Jurisdiction and Practice 173 (1850); G. Robinson, Handbook of Admiralty Law in the United States 42, 56, 88 (1939); G. Gilmore & C. Black, Law of Admiralty 23–24 (2d ed. 1975). At the very least, the opinion conveyed the strong implication that a case involving a tort occurring "in connection with a waterborne vessel," 409 U. S., at 254, would be deemed within the admiralty jurisdiction without further inquiry.

In *Foremost Ins. Co.* v. *Richardson, supra*, however, a case involving the collision of two pleasure boats on what we presumed to be navigable waters, we read *Executive Jet* for the broader proposition that a "significant relationship to traditional maritime activity" is required even for torts involving vessels. "Because the 'wrong' here," we said, "involves the negligent operation of a vessel on navigable waters, we believe that it has a sufficient nexus to traditional maritime activity to sustain admiralty jurisdiction in the District Court." 457 U. S., at 674. We then proceeded to consider and reject the petitioner's argument that outside the strictly commercial context "the need for uniform rules to govern conduct and liability disappears, and 'federalism' concerns dictate that these torts be litigated in the state courts." *Ibid.* To the contrary, we concluded, traditional admiralty concerns arise whenever the rules of navigation are implicated in a particular suit; a pleasure boat's failure to follow the "uniform rules of conduct" that govern navigation on navigable waters could have a "potential disruptive impact" on maritime commerce just as surely as could a similar transgression by a commercial vessel. *Id.*, at 675.

This discussion in *Foremost* has caused many lower courts to read the opinion as not only requiring a "significant relationship to traditional maritime activity" in all cases, *i. e.*, even when a vessel is involved, but as requiring more specifi-

cally a particularized showing that the activity engaged in at the time of the alleged tort, if generally engaged in to some indeterminate extent, would have an actual effect on maritime commerce. See *ante*, at 365–366, n. 4 (collecting cases). In my view the reading that imputes the latter requirement is in error. We referred to "the potential disruptive impact of a collision" merely to rebut the petitioner's argument that jurisdiction in that particular case would not further the general purposes of admiralty jurisdiction, since navigation by pleasure craft could not affect maritime commerce. It was enough in that case to answer that it could. But that response cannot reasonably be converted into a holding that *in every case* such an answer must be available—that no single instance of admiralty tort jurisdiction can exist where there is no potentially disruptive impact upon maritime commerce. No jurisdictional rule susceptible of ready and general application (and therefore no practical jurisdictional rule) can be so precise as to pass such an "overbreadth" test. One can afford, and perhaps cannot avoid, such case-by-case analysis for the few cases lying at the margins—when, for example, a plane falls into a lake—but it is folly to apply it to the generality of cases involving vessels.[2] Today's opinion, by engaging in an extended discussion of the degree to which fire (the instrumentality by which the damage in this particular case was caused) might disrupt commercial maritime activity, *ante*, at 362–364, reinforces this erroneous reading of *Foremost*.

What today's opinion achieves for admiralty torts is reminiscent of the state of the law with respect to admiralty contracts. The general test, of course, must be whether the

---

[2] The Court describes this point as a "demand for tidy rules." *Ante*, at 364, n. 2. I think it is rather an aversion to chaos—of the sort represented by the conflicting lower court decisions that the Court painstakingly describes, *ante*, at 365–366, n. 4, but makes no effort to alleviate. The Court's statement that "the formula initially suggested by *Executive Jet* and more fully refined in *Foremost* and in this case provides appropriate and sufficient guidance," *ante*, at 366, n. 4, is neither an accurate description of the past nor a plausible prediction for the future.

contract "touch[es] rights and duties appertaining to commerce and navigation," 3 J. Story, Commentaries on the Constitution of the United States 528 (1833). But instead of adopting, for contracts as we had (until today) for torts, a general rule that matters directly related to vessels were covered, we sought to draw the line more finely, case by case. That body of law has long been the object of criticism. The impossibility of drawing a principled line with respect to what, in addition to the fact that the contract relates to a vessel (which is by nature maritime) is needed in order to make the contract itself "maritime," has brought ridicule upon the enterprise. As one scholar noted in 1924, "[t]he rules as to building and repairing vessels"—the former having been deemed nonmaritime, see *People's Ferry Co. of Boston* v. *Beers*, 20 How. 393 (1858), and the latter maritime, see *New Bedford Dry Dock Co.* v. *Purdy*, 258 U. S. 96 (1922)— "and the results obtained therefrom, are so humorous that they deserve insertion in the laws of Gerolstein." Hough, Admiralty Jurisdiction—Of Late Years, 37 Harv. L. Rev. 529, 534 (1924).[3] There is perhaps more justification for this approach with respect to contracts, since in that field the "vessel" test would not be further limited by the "locality" test, as it is for torts. And I am not suggesting an abandonment of our approach in that other field, which by now has developed some rules, however irrational they may be.[4] But there is no reason for expanding that approach to the tort field. I agree with, and apply to today's opinion, the com-

---

[3] Those music lovers are better than I who immediately recognize Gérolstein as the fictitious European principality that is the setting of Offenbach's once-popular operetta, La Grande-Duchesse de Gérolstein.

[4] As Professor Black has put it, in the field of maritime contracts "[t]he attempt to project some 'principle' is best left alone. There is about as much 'principle' as there is in a list of irregular verbs. Fortunately, the contracts involved tend to fall into a not-too-great number of stereotypes, the proper placing of which can be learned, like irregular verbs, and errors in grammar thus avoided." Black, Admiralty Jurisdiction: Critique and Suggestions, 50 Colum. L. Rev. 259, 264 (1950) (footnote omitted).

mentary on an earlier judicial effort to do so: "The decision . . . seems . . . unfortunate as increasing complication and uncertainty in the law without, apparently, securing any practical gain to compensate for these disadvantages." Note, Admiralty Jurisdiction Over Torts, 16 Harv. L. Rev. 210, 211 (1903), discussing *Campbell* v. *H. Hackfield & Co., Ltd.* (D. Haw., Oct 21, 1902), aff'd, 125 F. 696 (CA9 1903).

The sensible rule to be drawn from our cases, including *Executive Jet* and *Foremost*, is that a tort occurring on a vessel conducting normal maritime activities in navigable waters — that is, as a practical matter, every tort occurring on a vessel in navigable waters — falls within the admiralty jurisdiction of the federal courts. *Foremost* is very clear that the *Executive Jet* requirement that the wrong bear a "significant relationship to traditional maritime activity" applies across the board. But it is not conclusive as to what is required to *establish* such a relationship in the case of torts aboard vessels. The "wrong" in *Foremost* not only occurred on a vessel *while it was engaged in* traditional maritime activity (navigating), but also consisted precisely of conducting that activity in a tortious fashion — and the discussion emphasized the latter reality. But the holding of the case did not establish (and could not, since the facts did not present the question) that the former alone would not suffice. In the case of a vessel it traditionally had sufficed, and *Foremost* gave no indication that it was revolutionizing admiralty jurisdiction. It is noteworthy, moreover, that a later case, *Offshore Logistics, Inc.* v. *Tallentire*, 477 U. S. 207 (1986), described the *Executive Jet* "relationship" requirement not with reference to the cause of the injury, but with reference to the activity that was being engaged in when the injury occurred: "[A]dmiralty jurisdiction is appropriately invoked here under traditional principles because the accident occurred on the high seas and in furtherance of an activity [transporting workers to a drilling platform at sea] bearing a significant relationship to a traditional maritime activity." 477 U. S., at 218–219. I would

hold that a wrong which occurs (1) in navigable waters, (2) on a vessel, and (3) while that vessel is engaged in a traditional maritime activity, bears a significant relationship to a traditional maritime activity.   A vessel engages in traditional maritime activity for these purposes when it navigates, as in *Foremost*, when it lies in dock, as in the present case, and when it does anything else (*e. g.*, dropping anchor) that vessels normally do in navigable waters.   It would be more straightforward to jettison the "traditional maritime activity" analysis entirely, and to return (for vessels) to the simple locality test—which in that context, as we observed in *Executive Jet*, "worked quite satisfactorily," 409 U. S., at 254. But that would eliminate what *Foremost* evidently sought to achieve—the elegance of a general test applicable to *all* torts. That test will produce sensible results if interpreted in the manner I have suggested.

This approach might leave within admiralty jurisdiction a few unusual actions such as defamation for "a libel published and circulated exclusively on shipboard," Hough, *supra*, at 531,[5] but there seems to me little difference in principle between bringing such an issue to the federal courts and bringing a slip-and-fall case.   In any event, exotic actions appear more frequently in the theoretical musings of the "thoroughbred admiralty men," *ibid.*, than in the federal reports.   The time expended on such rare freakish cases will be saved many

---

[5] It should not be thought that this approach will bring within admiralty jurisdiction torts occurring in navigable waters aboard any craft designed to carry people or cargo and to float.   For a discussion of what constitutes a "vessel," see generally G. Robinson, Handbook of Admiralty Law in the United States § 8, pp. 42–50 (1939).   The definition is not necessarily static.   "The modern law of England and America rules out of the admiralty jurisdiction all vessels propelled by oars simply because they are the smallest class and beneath the dignity of the court of admiralty; but long within the historic period, and for at least seven hundred years, the triremes and quadriremes of the Greek and Roman navies were the largest and most powerful vessels afloat."   *The Robert W. Parsons*, 191 U. S. 17, 32–33 (1903).

times over by a clear jurisdictional rule that makes it unnecessary to decide, in hundreds of other cases, what particular activities aboard a vessel are "traditionally maritime" in nature, and what effect a particular tort will have on maritime commerce. The latter tests produce the sort of vague boundary that is to be avoided in the area of subject-matter jurisdiction wherever possible.

> "The boundary between judicial power and nullity should . . . , if possible, be a bright line, so that very little thought is required to enable judges to keep inside it. If, on the contrary, that boundary is vague and obscure, raising 'questions of penumbra, of shadowy marches,' two bad consequences will ensue similar to those on the traffic artery. Sometimes judges will be misled into trying lengthy cases and laboriously reaching decisions which do not bind anybody. At other times, judges will be so fearful of exceeding the uncertain limits of their powers that they will cautiously throw out disputes which they really have capacity to settle, and thus justice which badly needs to be done will be completely denied. Furthermore, an enormous amount of expensive legal ability will be used up on jurisdictional issues when it could be much better spent upon elucidating the merits of cases. In short, a trial judge ought to be able to tell easily and fast what belongs in his court and what has no business there." Z. Chafee, The Thomas M. Cooley Lectures, Some Problems of Equity 312 (1950) (quoting *Hanover Star Milling Co.* v. *Metcalf*, 240 U. S. 403, 426 (1916) (Holmes, J., concurring)).

For these reasons, I concur in the judgment.