OPINION OF THE COURT
Randolph Jackson, J.
The plaintiff, James Hartley, was allegedly injured on or about October 3, 1989 while working as a commercial diver in the employ of MVN Associates, Inc. (MVN). MVN had contracted with Healy Tibbitts Construction Co., Inc. (Healy) to supply divers in conjunction with Healy’s contract with the City of New York (City) to undertake an outfall sewer project at the Owls Head Water Pollution Control Project located in Brooklyn. Plaintiff brought this action pursuant to Labor Law §§ 200, 240, 241, 431 and 435 and common-law negligence principles.
Defendants, Healy and City, each move for an order pursuant to CPLR 3211 (a) (2) dismissing the plaintiff’s complaint. Third-party defendant, MVN, moves for an order dismissing the third-party complaint of Healy.
FACTS
On October 3, 1989, the plaintiff was employed as a marine diver by MVN. Healy had contracted with the City of New York Department of Environmental Protection to perform an outfall sewer project (Project No. WP-288;3A) at the Owls Head Water Pollution Control Project, Brooklyn, New York. In conjunction with that contract, Healy contracted with MVN to provide certain diving services including the work to *543 be performed by MVN (and the plaintiff) on the date of the subject incident.
At the time of the accident, MVN was in the process of cutting underwater metal sheeting to grade regarding installation of the outfall sewage pipe. As part of the project, underwater trenches had been dug from the shore extending approximately 135 feet into the New York Harbor in a goal-post type configuration. Steel sheeting was driven into the trenches which then served as a concrete form. Prior to pouring the concrete, MVN divers would cut the steel sheeting to a certain grade. This activity was part of the installation of the actual outfall pipe which would serve to dispose of treated waste from the Owls Head plant into the water.
Generally, and on the date of the subject incident, the plaintiff worked with a team of two other MVN divers, Mark Ciliento and Mark McMahon. The plaintiff made dives in a rotating schedule with the other two divers. MVN diving operations were conducted from a free-floating barge in the harbor which was leased by Healy. While the plaintiff was actually underwater, one of the other divers on the barge would act as a "line tender”. A line tender would feed hose to the diver and monitor the diver’s equipment. The other individual on the barge would act as a "radio tender”. This individual would keep in constant contact with the diver via radio which was kept in a radio shanty. The radio tender would relay commands and/or instructions to the diver and would also monitor the diver’s depth with the device known as a pneumofathometer.
On October 3, 1989, the plaintiff made his first dive from the barge at approximately 1:00 p.m. Diving records indicated that the plaintiff was at a depth of 44 feet on his first dive on October 3, 1989. The plaintiff worked for approximately 40 minutes, kneeling on an H-beam which was welded onto the metal sheeting (approximately six to seven feet above the ocean bottom), cutting the metal sheeting with a torch. At his deposition, the plaintiff testified that during his first dive that day, he felt discomfort in his back while attempting to jerk a piece of metal back and forth. The plaintiff claims he requested permission to come to the surface at that time. Mark Ciliento told him via radio that more metal sheets should be cut during this dive. Someone asked the plaintiff if he needed any further burning rods, to which Mr. Hartley responded he would retrieve some from the bottom. After the plaintiff’s work was completed, Mr. Ciliento informed the plaintiff that *544 he did not have to be decompressed (i.e., remain at a depth of 10 feet under water for some period of time) and that he should come straight to the surface.
Fifteen minutes later he returned for a second dive. During the second dive, the plaintiff went back down to the same location and continued to cut steel sheets with his torch. After the dive, the plaintiff was advised to remain at the 10-foot level for decompression for three minutes. After reaching the surface and climbing onto the barge, the plaintiff was escorted to a decompression chamber where he spent five minutes at a pressure equal to 10 feet below the surface.
On October 4, 1989, the plaintiff claims to have suffered from numbness and tingling in his left arm and elbow. That morning, the plaintiff returned to the job site and reported his complaints to his co-workers, Mr. McMahon and Mr. Ciliento. During the morning, the plaintiff acted as a tender for Mr. McMahon’s dive. At 1:00 p.m., the plaintiff advised Mr. McMahon that he wanted to dive to the same location he was at on October 3, 1989 in order to see if his pain (numbness and tingling) would go away (which would indicate a decompression illness). The plaintiff testified, and diving records indicate, that he dove to a depth of 52 feet on October 4, 1989. After some period of time at the bottom, the plaintiff’s symptoms dissipated. At that time, he was immediately brought back to the surface for treatment in the decompression chamber and he was referred for medical treatment.
On October 5, 1989, the plaintiff went back to the job site and spoke with Mr. McMahon. The plaintiff claims that he asked Mr. McMahon why the diving records showed a 52-foot depth during his dive on October 4 and the records showed only a 44-foot depth on October 3 while diving at the same location. According to the plaintiff’s testimony, he and Mr. McMahon believed there was a miscalculation of the plaintiff’s depth during his first dive on October 3, 1989. It was Mr. Hartley’s impression that his first dive on October 3, 1989 was of a depth (over 50 feet rather than 44 feet) which would have required him to have decompression (which was not given).
According to the plaintiff’s bill of particulars, the defendants were negligent in failing to decompress him properly and adequately after his October 3, 1989 dive and that they were negligent in allowing him to dive again on October 4, 1989, and that they again inadequately decompressed him at that time. The plaintiff alleges to have sustained decompres *545 sion sickness (commonly referred to as the bends) with related symptoms.
DISCUSSION
28 USC § 1333 states:
"The district courts shall have original jurisdiction, exclusive of the courts of the State, of:
"(1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases other remedies to which they are otherwise entitled.”
The "saving to suitors” clause contained in 28 USC § 1333 (1) permits State courts to adjudicate admiralty claims, provided that they apply Federal maritime law. (Lerner v Karageorgis Lines, 66 NY2d 479 [1985].) In cases involving admiralty or maritime jurisdiction "the state courts are bound to apply Federal law * * * in order to secure a single and uniform body of maritime law.” (Matter of Rederi [Dow Chem. Co.], 25 NY2d 576, 581 [1970].)
Federal maritime law governs an action if the alleged incident occurs or is located on navigable waters and if the wrong bears a significant relationship to traditional maritime activity. (Executive Jet Aviation v City of Cleveland, 409 US 249 [1972].)
Plaintiff claims that pursuant to Kahn v Gates Constr. Corp. (103 AD2d 438 [2d Dept 1984]), this incident did not occur in navigable waters.
In Kahn (supra), the Court held that an incident in which a commercial diver who had lost three of his fingers while laying a sewer pipe on the ocean bottom was not subject to Federal maritime law. The Court based its decision on the fact that the accident occurred on the ocean bottom beneath navigable waters. The Submerged Lands Act (43 USC § 1301 [a] ) grants a State sovereignty over: "all lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide and seaward to a line three geographical miles distant from the coast line of each such State and to the boundary lines of each such State where in any case such boundary as it existed at the time such State became a member of the Union, or as heretofore approved by Congress, extends seaward (or into the Gulf of Mexico) beyond three geographical miles.”
In Kahn (supra, at 443), "[s]ince the alleged tort took place *546 on land over which New York State exercised sovereignty, Federal law would not be applicable” (see, California ex rel. State Lands Commn. v United States, 457 US 273, 283, reh denied 458 US 1131; United States v Alaska, 422 US 184, 187, reh denied 423 US 885).
The instant case is clearly distinguishable from Kahn (supra). Plaintiffs alleged decompression injuries did not occur while he was on the sea floor. It is alleged in this case that the decompression injury occurred because plaintiff was not properly decompressed either in a decompression chamber (which was located on a barge on the surface) or because plaintiff was not instructed to maintain a position at various levels/checkpoints below the surface for a sufficient period of time to allow all of the excess nitrogen to escape from his blood system.
Given this court’s determination that plaintiffs injuries did not occur on land beneath navigable waters, it is clear that the first prong of the test set in Executive Jet (supra), that the incident occurred in navigable waters, is met. It is undisputed that plaintiff was diving in New York Harbor.
The United States Supreme Court in Sisson v Ruby (497 US 358 [1990]) specifically addressed the second prong of the test enunciated in Executive Jet (supra), that in order for Federal maritime law to apply the wrong must bear a significant relationship to traditional maritime activity. The Court in Sisson determined that Federal maritime jurisdiction will apply to an incident which involves a " 'potential hazard to maritime commerce arising] out of activity that bears a substantial relationship to traditional maritime activity’.” (497 US, at 362.)
As to the potential hazard to maritime commerce, the Court stated that "[w]e determine the potential impact of a given type of incident by examining its general character. The jurisdictional inquiry does not turn on the actual effects on maritime commerce [of the incident in this case]; nor does it turn on the particular facts of the incident in this case * * * Rather, a court must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity.” (Sisson v Ruby, 497 US, at 363, supra.)
The incident involved here is an alleged failure on the part of the defendants and third-party defendant to properly decompress a diver involved in underwater construction causing him to get "the bends”.
*547 The proliferation of this type of incident would tend to make commercial diving a far more hazardous profession than it already is and would certainly affect the availability of divers, as well as the cost of hiring them.
Once it has been shown that there is a potential hazard to maritime commerce, a court must determine whether there is a substantial relationship between the activity giving rise to the incident and traditional maritime activity. As with the previous portion of the court’s analysis, "the relevant 'activity’ is defined not by the particular circumstances of the incident, but by the general conduct from which the incident arose. In Executive Jet, for example, the relevant activity was not a plane sinking in Lake Erie, but air travel generally.” (Sisson v Ruby, 497 US, at 364, supra [citations omitted].)
In the instant case, the activity in question is underwater construction. Certainly, underwater construction is substantially related to traditional maritime activity. (See, for example, Quattlebaum v Foster Mar. Contrs., 600 F Supp 158 [SD Fla 1985] [a diver sustained injuries while excavating a trench for a subsequent water main]; Smith v Brown & Root Mar. Operators, 243 F Supp 130 [WD La 1965] [a diver suffered the bends while performing underwater cutting operations].)
Finally, in a general sense, the application of Federal maritime law is warranted here since " 'the protection of maritime commerce * * * cannot be fully vindicated unless 'all operators of vessels on navigable waters are subject to uniform rules of conduct’.” (Sisson v Ruby, 497 US, at 367, supra; see also, Foremost Ins. Co. v Richardson, 457 US 668, 675 [1982].)
LABOR LAW
Federal maritime law, when applicable, preempts State law and exclusively governs the rights and liabilities of the parties. (Pope & Talbot v Hawn, 346 US 406 [1953].) The Appellate Division, Second Department, has held that "Federal maritime law, which imposes a standard of reasonable care, and the doctrine of comparative negligence requires the dismissal of plaintiffs cause[s] of action based on the New York State Labor Law, because [defendants] could be held strictly liable under that cause of action.” (Stuto v Coastal Dry Dock & Repair Corp., 153 AD2d 937, 939 [2d Dept 1989].)
Accordingly, plaintiffs’ Labor Law causes of action must be dismissed.
*548 COMMON-LAW NEGLIGENCE
In his affidavit in opposition to defendants’ motions, plaintiff, James Hartley, stated that:
"Healy provided the barges, set up the barges, dive shantys, cranes and deck equipment * * * That my and other divers’ complaints to my employer, MVN Associates, Inc., in connection with dive problems such as barge location or the great distance between that part of the barges from which we were diving to the decompression chamber which was approximately 200-250 feet from where the diving was taking place, far in excess of the distance on any other job I’ve done where the chamber is generally within 50’ of the barge dive site, were met with the answer, 'whatever Oscar [Healy’s foreman] wants’ * * *
"That it was Oscar’s employer, Healy, which supplied the decompression chamber and located it on the barge.
"The Court should further note that the location of the decompression chamber relative to the dive location is crucial as a diver has a maximum of three minutes to get into the chamber after surfacing. This time includes the time to be lifted onto the barge, have all equipment removed, (this includes a helmet, dive suit, weight belt, removing and disconnection of all lines and hoses, etc.) and get into the chamber and have it at the necessary pressure. That this was an impossibility as there was equipment over the barge floor which made walking to the chamber from the dive location difficult, walkways over which I had to go from barge to barge and taking into consideration the fact the barges were constantly moving due to wave action.
"That this was the case on the day I was injured on the bottom, brought up and decompressed. There was insufficient time to get into the chamber. That Oscar was aware of the problem, to which his response was 'walk faster’.”
After examining the plaintiff’s affidavit and the other papers submitted with these motions, this court cannot determine conclusively that plaintiff’s alleged injuries were not caused in part by Healy’s negligence. Accordingly, Healy’s motion to dismiss must be denied. (Andre v Pomeroy, 35 NY2d 361 [1974].)
This court is cognizant of Healy’s argument that the statements in plaintiff’s affidavit contradict his examination before trial testimony, specifically as to the amount of time it actually took for plaintiff to make his way to the decompression *549 chamber. Counsel will certainly have the opportunity at trial to cross-examine plaintiff as to this discrepancy.
As there has been no allegation by any party as to negligence on the part of the City, the City’s motion to dismiss plaintiff’s complaint and all cross claims against it is granted. The action as to the City is hereby severed.
THIRD-PARTY ACTION
Defendant, Healy, asserts a claim for indemnification pursuant to a written indemnification agreement contained in its contract with MVN.
The plaintiff made claim and has been receiving compensation benefits from MVN administered through the State Insurance Fund under the Longshore and Harbor Workers’ Compensation Act (LHWCA) (33 USC § 901 et seq.).
The LHWCA (33 USC § 905 [b]) states in pertinent part: "and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.”
This court must determine whether Healy was a vessel pursuant to the LHWCA. Healy’s status as a vessel or nonvessel is significant, because if Healy is considered a vessel, then a contribution or an indemnification claim by Healy against plaintiff’s employer (MVN) is barred.
A nonvessel, on the other hand, may bring an action for indemnity based on an express agreement "since the employer’s liability 'springs from an independent contractual right’.” (Pennisi v Standard Fruit & S. S. Co., 206 AD2d 291-292 [1st Dept 1994]; Stuto v Coastal Dry Dock & Repair Corp., supra.)
The diving barges from which plaintiff was working were leased by Healy for this particular project. 33 USC § 902 (21) provides as follows: "Unless the context requires otherwise, the term 'vessel’ means any vessel upon which or in connection with which any person entitled to benefits under this Act suffers injury or death arising out of or in the course of his employment, and said vessel’s owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member.”
The significant factors to be determined as to whether Healy was a vessel under the statute is whether Healy had exclusive possession and control of the vessel during the period of its use. (See, Blanco v United States, 775 F2d 53 [2d *550 Cir 1985]; Admiral Towing Co. v Woolen, 290 F2d 641 [9th Cir 1961].)
The information provided to the court in connection with these motions is not sufficient for it to determine conclusively that Healy exercised exclusive possession and control over the barges. There is an issue of fact, therefore, as to whether Healy was a vessel under the LHWCA and the motion to dismiss the third-party complaint must be denied. (Andre v Pomeroy, supra.)
Accordingly, defendant Healy’s motion to dismiss plaintiffs’ complaint as to it is granted only to the extent that plaintiffs’ causes of action brought pursuant to the New York Labor Law are dismissed. The negligence claims are allowed to stand. Defendant City’s motion to dismiss plaintiffs’ complaint and all cross claims as to it is granted and those actions are severed. Finally, third-party defendant MVN’s motion to dismiss Healy’s third-party complaint is denied.