**SEA LEGS MARINA, INC. Plaintiff,**

v.

**Richard SAYRE, Individually and M/V Elenor, Defendants.**

**No. 97–6191–CIV.**

United States District Court, S.D. Florida.

Feb. 24, 2000.

Kurt S. Hilberth, Hollywood, FL, for plaintiff.

James W. Stroup, Fort Lauderdale, FL, for defendant.

## ORDER

ROETTGER, District Judge.

Defendant filed a motion to quash asserting lack of jurisdiction on the morning when the trial was to begin in the afternoon. The pertinent facts for resolution of this motion appear to be undisputed. The case involves M/V Elenor which is a three masted wooden-hulled sailing vessel about 100 feet in length built in 1906, apparently in Denmark. Defendant Sayre bought the vessel for 700 dollars at a U.S. Marshal's sale in December, 1994 or January, 1995. The vessel was then tied up at Broward Marine on the Dania cut-off canal; defendant had the vessel towed to Plaintiff's marina approximately 3 miles south along the Intracoastal Waterway. Plaintiff's marina borders the east bank of the Intracoastal Waterway.[1]

Plaintiffs filed suit in 1997 seeking damages for unlawful trespass by Defendant; and to recover reasonable wharfage charges for Defendants' continued use. Upon Plaintiff's subsequent motion for emergency injunctive relief based on the vessel's danger to navigation in the Intracoastal Waterway in the event of M/V Elenor's sinking, the court heard argument and with the lawyers in agreement, the court required the vessel to be moved within 30 days expiring on July 31, 1999. Defendant took no action to comply with the court's order and the court ordered on September 1, 1999, that the matter be set on the next available trial calendar. The matter was set for trial in February, 2000.

Defendant has taken no action to move the vessel since the vessel's arrival at Plaintiff's marina and has only paid part of the wharfage which has accrued on Defendant's vessel. Defendant's vessel has been tied up to Plaintiff's wharf alongside the Intracoastal Waterway since it arrived there in January 1995.

Apparently the vessel has no crew, no sails or means of locomotion and has not left the dock at any time. Defendant's counsel describes the status of this vessel as a state of "controlled sinking". Five to eight pumps are maintained on the vessel at all times to keep it from sinking. Apparently, it has sunk on more than one occasion and been refloated.

The basis for the motion to quash for lack of admiralty jurisdiction is that the vessel M/V Elenor is a "dead ship" in that it does not engage in navigation or maritime commerce. Defendant relies upon the "dead ship" doctrine as precluding this court from exercising admiralty jurisdiction over M/V Elenor. For example, in *Murray v. Schwartz*, 175 F.2d 72 (2nd Cir.1949), "a wharfage contract touching a dead ship is not maritime, and a contract which is not maritime cannot create a lien subject to the jurisdiction of admiralty." *Id.* at 72. Controlling 5th Circuit law supports that conclusion. In *Amoco Oil v. M/V Montclair*, 766 F.2d 473 (11th Cir. 1985), the 11th Circuit's primary focus is whether the vessel has been withdrawn from navigation or maritime commerce.

But that is not the end of the inquiry: in *Sisson v. Ruby*, 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990), the Supreme Court stated in a case involving a fire

---

1. Plaintiff is not a conventional marina with repair facilities or piers for dockage. It occupies a narrow strip of land between the Intracoastal Waterway and State Highway A1A in Hollywood, Florida. Apparently, there is one other vessel besides M/V Elenor that ties up there, a charter fishing boat.

aboard a yacht at a marina: "Clearly, the storage and maintenance of a vessel at a marina on navigable waters is substantially related to 'traditional maritime activity' ....." *Id.* at 367, 110 S.Ct. 2892. The court rejected a narrow focus on navigation because it would not serve the federal policies that underline their jurisdictional test. "The fundamental interest giving rise to maritime jurisdiction is 'the protection of maritime commerce'." *Ibid; Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 674, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982).

The question of M/V Elenor's being a hazard to maritime commerce is more than a mere possibility. Defendant asserts that the vessel sinks "monthly", but is kept afloat by numerous pumps. The Intracoastal's width is estimated at about 200 feet in this area of Hollywood and if the vessel sinks at Plaintiff's wharf and rolls toward the waterway its 3 masts will occupy a considerable fraction of the distance across the Intracoastal Waterway.

A more immediate problem presents itself because Plaintiff has never had the vessel arrested. Consequently, the court is lacking *in rem* jurisdiction because Supplemental Rule C has not been complied with. *Nuta v. M/V Foutas Four,* 753 F.Supp. 352 (S.D.Fl.1990). Inasmuch as the arrest is something that can be accomplished readily by Plaintiff and this vessel appears unlikely to be able to move outside the jurisdiction, the court has filed this order in an effort to expedite ultimate disposition of this matter. Therefore, it is

**ORDERED AND ADJUDGED** that the court will give the Plaintiff 20 days to effect an arrest under Supplemental Rule C; failure to do so will result in dismissal of the case for lack of *in rem* jurisdiction.

If the vessel is promptly arrested, the court directs counsel for both sides to file within 20 days of the M/V Elenor's arrest supplemental memoranda directed to the

tension between the "dead ship" doctrine and the jurisdictional bases of *Sisson v. Ruby,* 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990) and its antecedents:[2] *viz.,* if the "dead ship" is the threat to maritime commerce, does the admiralty court have maritime jurisdiction despite the "dead ship" doctrine?[3]

---

**2.** *Executive Jet Aviation Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972); *Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982).

**3.** The court notes the vessel in *Sisson* was in navigation at the time of the fire.