SAUNDERS, J.
dissents and assigns written reasons.
hi disagree with the majority opinion in both its methodology and result regarding whether the M/V Crown is a “vessel” for purposes of federal admiralty jurisdiction, and whether federal admiralty jurisdiction is proper. Regarding methodology and whether the M/V Crown is a “vessel,” the majority opinion seems to draw a bright-line rule that since our legislature enacted La.R.S. 27:65 “Louisiana’s permanently moored casinos are not vessels in navigation for purposes of maritime jurisdiction.” Such a bright-line rule does not follow the methodology that is mandated by the Unit *688 ed States Supreme Court in Stewart v. Dutra Construction Company, 543 U.S. 481, 125 S.Ct. 1118, 160 L.Ed.2d 932 (2005).
The Stewart court, as courts have done since nearly the dawn of this issue, looked to 1 U.S.C.A. § 3 to determine if a watercraft is a “vessel.” “The word ‘vessel’ includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water.” 1 U.S.C.A. § 3 (emphasis added). The majority opinion fails to specifically address whether the M/V Crown fits within the language of 1 U.S.C.A. § 3. Instead, it cites De La Rosa v. St. Charles Gaming Co., 474 F.3d 185 (5th Cir.2006) as support for its conclusion that |;>the M/V Crown is not a “vessel” for purposes of federal admiralty jurisdiction. It is true that in De La Rosa the United States Fifth Circuit found that the M/V Crown was not a “vessel” in navigation for purposes of maritime jurisdiction. However, Breaux contends that the record available to the De La Rosa court was insufficient and explains that this insufficiency is why-the United States Fifth Circuit reached its conclusion. Our court is not privy to the record available to the De La Rosa court. An appellate court decides its cases on the record before it. See La.Code Civ.P. art. 2164. I feel that this court should focus on the record before it and make a proper analysis of whether the M/V Crown is a “vessel” under 1 U.S.C.A. § 3 rather than create a hard and fast rule that federal admiralty jurisdiction does not apply to all permanently moored watercraft casinos in Louisiana.
As previously stated, I also do not agree with the result of the majority opinion regarding whether the M/V Crown is a “vessel” for purposes of federal admiralty jurisdiction. My reading of the record before us is that the M/V Crown is clearly “a watercraft capable of being used as a means of transportation on water.” 1 U.S.C.A. § 3. The majority opinion states, “the [M/V Crown] still contains the equipment necessary for navigation and, theoretically, could sail again in the future if brought back into compliance with Cost Guard regulations.” My reading of 1 U.S.C.A. § 3 is that having the proper paperwork from the Coast Guard is not a factor in whether a watercraft is a “vessel” for federal admiralty jurisdiction purposes. Rather, this statement made by majority opinion that the M/V Crown “contains the equipment necessary for navigation and ... could sail again in the future” is all that is necessary for this watercraft to be a “vessel” under 1 U.S.C.A. § 3.
Further, my opinion that the M/V Crown is a “vessel” under 1 U.S.C.A. § 3 ladoes not end the analysis necessary to determine whether federal admiralty jurisdiction is applicable to the case before us. Federal admiralty jurisdiction and vessel status are separate issues.
The majority opinion finds no federal admiralty jurisdiction in this case. Again, I disagree with the majority opinion’s methodology and result.
The proper methodology is set forth in Grubart, Inc. v. Great Lakes Dredge & Dock Company, 513 U.S. 527, 534, 115 S.Ct. 1043, 1048, 130 L.Ed.2d 1024 (1995). In Grubart, the United States Supreme Court, when discussing the proper test to determine whether federal admiralty jurisdiction is applicable to a case before a court, stated the following:
a party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity. A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered *689 on land was caused by a vessel on navigable water. 46 U.S.C.App. § 740. The connection test raises two issues. A court, first, must “assess the general features of the type of incident involved,” [Sisson v. Ruby,] 497 U.S. [358], at 363, 110 S.Ct. [2892], at 2896, 111 L.Ed.2d 292, to determine whether the incident has “a potentially disruptive impact on maritime commerce,” id., at 364, n. 2, 110 S.Ct., at 2896, n. 2. Second, a court must determine whether “the general character” of the “activity giving rise to the incident” shows a “substantial relationship to traditional maritime activity.” Id., at 365, 364, and n. 2, 110 S.Ct. at 2897, 2896, and n. 2.
Grubart, Inc., 513 U.S. at 534, 115 S.Ct. at 1048.
Accordingly, the proper methodology consists of a determination of whether Breaux has met the location test and the two prongs of the connection test. Here, the majority opinion fails to address the location test or the first prong of the connection test. Rather, it simply states “Breaux was injured while on a gaming boat ... not performing any traditional maritime activity.”
Finally, I disagree with the result of the majority opinion that federal admiralty 1 Jurisdiction is not applicable to this case. Clearly, Breaux has met the location test. The alleged tort, serving excessive alcoholic beverages to an intoxicated passenger, occurred on navigable water, i.e. the Calca-sieu River.
I also feel that Breaux has met the first prong of the connection test. This court, in Quinn v. St. Charles Gaming Co., Inc., 01-794, p. 4 (La.App. 3 Cir. 2/6/02), 815 So.2d 963, 967, writ denied, 02-694 (La.4/12/02), 813 So.2d 412, dealt with an issue nearly identical to the one before us. In Quinn, the estate of a motorist who was killed in a collision with an extremely intoxicated casino patron brought a tort action against the casino boat company for its provision of excessive amounts of alcohol to the patron without adequate supervision. This court, in determining whether Quinn’s estate met the first prong of the connection test heeded the direction of Grubart, 513 U.S. at 538-39, 115 S.Ct. at 1051 and determined “the intermediate level of possible generality.” It did so by describing it “as the provision of alcohol to passengers on board a vessel without adequate supervision, with the occurrence of damages on land.” Quinn, 815 So.2d at 967.
Here, the incident can be characterized “as the provision of alcohol to passengers on board a vessel without adequate supervision, with the occurrence of damages” on that very same boat. Id. The Quinn court then found that “the provision of alcohol in this manner could possibly have a disruptive effect on maritime commerce, such as where a large party of passengers become inebriated injuring themselves or other patrons or fall overboard causing a disruption to maritime commerce due to search and rescue operations.” Based on the reasoning of Quinn, I feel that Breaux has met the first prong of the connection test.
Likewise, I feel that the Quinn court’s reasoning dictates a finding that Breaux also met the second prong of the connection test. The second prong of the connection test was discussed in Grubart, 513 U.S. at 539-40, 115 S.Ct. at 1051, wherein the United States | ¡^Supreme Court stated:
In the second Sisson enquiry, we look to whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity. We ask whether a tortfeasor’s activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally *690 subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand.
In performing the proper analysis of the connection test, the Quinn court stated, “[w]e have no difficulty in finding that the general character of the activity at issue shows a substantial relationship to a traditional maritime activity. The duties owed by vessel owners to their passengers have long been found a traditional maritime concern.” Quinn, 815 So.2d at 968. I agree with the Quinn court. Carrying passengers and providing for their safety are clearly a traditional maritime activities.
The majority opinion distinguishes Quinn from the case before us by pointing out that Quinn was decided while the M/V Crown was conducting cruises. While this is accurate, whether the M/V Crown was conducting cruises is not relevant as to why Breaux cited Quinn. Breaux cited Quinn to bolster her position that this court has already reached a determination on whether federal admiralty jurisdiction is applicable to the M/V Crown in its distribution of alcoholic beverages to patrons and the resulting damages. Whether the M/V Crown conducts cruises is a relevant factor in determination of its status as a “vessel,” not a fact conveniently necessitating disregard through distinguishment.
In my view, given the analytical framework established by the United States Supreme Court, and the proper application of that framework, federal admiralty jurisdiction applies to the case before us. Accordingly, I would affirm the trial court and deny the writ.
I would note that the defendant, St. Charles Gaming Company, Inc. (St. Charles), while conceding the capability of the M/V Crown to be used in navigation, countered that it would lose its gaming license if it did navigate. What St. Charles does not say is that the 1 ^legislation prohibiting its gaming while in navigation was enacted at its request and the request of all gaming watercraft owners. They did so to increase their profits by decreasing their costs through employing a smaller crew and increasing their revenue by not having players leave the watercrafts rather than be trapped on them during a cruise. St. Charles has benefitted greatly from the legislature granting its request. Not satisfied, it now invites us to relieve it from Jones Act Protection for its crew and passengers as a byproduct of legislature that has already given it great benefit. In my view, we should decline this invitation. Accordingly, I respectfully dissent.